**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Oscar E. HYDE et al., Defendants-
Appellants.**

**No. 27777.**

United States Court of Appeals,
Fifth Circuit.

June 23, 1971.

Rives, Circuit Judge, filed dissenting opinion.

Rives, Circuit Judge, dissented from denial of petition for rehearing by panel.

Gewin, Coleman, and Godbold, Circuit Judges, did not participate on petition for rehearing en banc.

L. Drew Redden, R. Merritt, Rogers, Rogers, Howard, Redden & Mills, Birmingham, Ala., for Oscar E. Hyde.

James M. Fullan, Jr., Beddow, Embry & Beddow, Birmingham, Ala., for Richmond M. Flowers.

Reber F. Boult, Jr., Staff Counsel, The Roger Baldwin Foundation of ACLU, Inc., Charles Morgan, Jr., Director, Atlanta, Ga., for Joe B. Gantt; Melvin L. Wulf, Eleanor Holmes Norton, New York City, of counsel.

Wayman G. Sherrer, U. S. Atty., R. Macey Taylor, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before RIVES, WISDOM, and CLARK, Circuit Judges.

WISDOM, Circuit Judge:

Oscar E. Hyde, Richmond Flowers, Joe Breck Gantt, and James C. Kelly, were charged with extortion and conspiracy to extort [1] in violation of the Hobbs Act, 18 U.S.C. § 1951.[2] By statutory definition the extortion must affect interstate commerce. Shortly before the trial, Kelly suffered a heart attack and the court granted Kelly's motion for a continuance and a severance. (See Part VI of this opinion.) After a trial lasting six weeks, the jury found Hyde and Flowers guilty on all counts. Each was sentenced to serve a term of eight years on each count, the terms to run concurrently. Hyde was fined $10,000 on each of the first two counts and Flowers was fined $5,000 on each count. Gantt was convicted on the three counts with which he was charged.[3] He was given concurrent sentences of five years on the first two counts, which were suspended; he was sentenced to serve one year and a day on count four.

Flowers was the Attorney General of Alabama from January 1963 to January 1967; Gantt was his top assistant. Hyde was close to Flowers as a friend, political supporter, and business associate.[4] The

---

1. Hyde and Flowers were each charged on two counts of conspiracy (I and II) and on two counts of substantively violating the Act (III and IV). Gantt was charged on Counts I, II, and IV. Kelly was charged on counts I and II. Six others were named as coconspirators but not indicted.

2. The language of the statute is as follows:

§ 1951. Interference with commerce by threats or violence

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

 * * * * *

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

3. See footnote 1.

4. Hyde, Flowers, and Kelly, had financial dealings among themselves for a number of years. Flowers became president of Alabama General Insurance Company in 1956; Kelly was the corporation's secretary. After several years the company became insolvent. Flowers and Kelly endorsed the company's note held by a Florida bank. In the late 1950's Flowers and Kelly together acquired several businesses in Mississippi for the avowed purpose of making sufficient money to pay off the note. From the time the note was executed through the 1963 election of Flowers as Attorney General no payments were made on the note. Then, in

theory of the Government's case is that during the years Flowers was in office the defendants conspired to extort payments from life insurance companies and small loan companies in Alabama under the threat of Flowers's taking certain action (or, in other cases, failing to take certain action) that would have the effect of preventing the companies from doing business in the State.

■ One of the duties of the Attorney General of Alabama, by statute, is to enforce the laws regulating small loan companies with respect to loans in excess of $300. The Attorney General is also the State Securities Commissioner. In this capacity his duties include the approval of all intrastate public offerings of securities and the regulation of broker-dealers handling intrastate sales of stock issues. Customarily in Alabama a particular Assistant Attorney General handled matters involving the Securities Commission. When Flowers assumed office he relieved Owen Bridges, long-standing Assistant Attorney General-Assistant Securities Commissioner of all duties relating to securities. In his place Flowers appointed Gantt. During the period that Bridges was Assistant Securities Commissioner, he had supervised all applications for the sale of stock and had affixed the signature of the Attorney General to orders permitting the sale of insurance stock. After Bridges's removal, Flowers himself, on Gantt's recommendation, would sign the orders approving the sale of public issues of stock. Flowers, therefore, knew or should be presumed to have known of every application to the State Securities Commission for approval of a public offering of securities.

To put this case in context we sketch some of the facts showing how the defendants operated.

The defendants threatened certain small loan companies that unless pay-offs were made to them they—through Flowers as Attorney General—would put the companies out of business by filing suits in state courts showing that the companies were charging illegally high rates for their loans. The defendants threatened certain life insurance companies that unless payoffs were made to them they—through Flowers as the Securities Commissioner—would not approve intrastate stock issues necessary for the companies to do business and would not license stock salesmen.

In a typical situation Hyde or one of the unindicted conspirators made threats —almost always oral threats—to the victims. In one case, however, Gantt, under the pretext of a routine inspection of Century Discount of Prichard, a small loan company, removed some of the company's records necessary to its business operations; at the same time, Flowers was causing a quo warranto proceeding to be filed against the company on the ground that it was operating contrary to law; later Hyde communicated to the parent company that the suit could be dismissed and the records returned *for a price*; the company paid the price—$62,-000. Typically, the extortion was paid under seemingly legitimate contracts. For the loan companies, the contracts were for credit life insurance, a form of insurance on debtors to assure repayment of loans. For the life insurance companies, the contracts were usually for advisory services in connection with stock sales. All of these contracts were shams: the interested parties understood from the beginning that no insurance or advisory service of real value was being purchased. The companies to which payments were made channeled the funds to the defendants, usually to Hyde.

Hyde was the most visibly active of the defendants: he conveyed most of the threats and arranged the payments. Gantt's position, however, made him an important participant too. For example, he helped arrange the contract by which Trans-Southern obligated itself to pay $90,000 to the defendants. Trans-South-

response to pressures for payment, Hyde and others persuaded the bank to settle

the note for $50,000. Hyde put up the $50,000 to pay the bank.

ern was interested in obtaining approval of the sale of stock in Alabama and also in obtaining approval of exempt sales prior to the public offering. Donald Orr, then organizing Trans-Southern, met with Hyde who told him that in order to have certain exemptions approved it would cost him $25,000 and to obtain approval of the public issue of stock it would cost him an amount equal to 5 percent of the amount of the issue. Orr agreed to this, paid the $25,000, and received the exemptions. At the direction of Hyde, checks totaling $20,000 were made payable to a law firm in Montgomery about which Orr knew nothing, a law firm that did no legal service for Orr, and $5,000 to a company that had no connection with Orr and performed no service for him or for his company. After the exemptions had been issued and the approval of the public issue had been obtained, Gantt called Orr and told him to come to Montgomery. The purpose of the meeting as Gantt explained to Orr was to put into writing the agreement Orr had previously made with Hyde. This agreement obligated Trans-Southern to pay $5,000 a month to Security Merchants, a shell corporation, until $90,000 had been paid. Orr paid some $70,000 on the contract but did not pay any more after Flowers left office. Even though under the terms of the contract the sum of $20,000 was still owing, Security Merchants took no action to recover this significant sum. When the details of the contract were being explained to Orr by Gantt, Flowers made a brief appearance and told Orr that the execution of the contract as suggested by Gantt and Moore was necessary "in order to keep Oscar [Hyde] happy".

Flowers attempted, not too successfully, to stay in the background. Essential to all the schemes however was the use of his office as an ever-present sword of Damocles dangling over the heads of his victims. He made a number of statements to victims and to neutral third parties indicating that Hyde spoke for him. For instance, Hyde offered Aspinwall, President of United Security Life Insurance Company, all of the credit life insurance business in Alabama. After Aspinwall questioned his ability to produce such business, Hyde arranged for Aspinwall to meet with Flowers. Flowers confirmed to Aspinwall that Hyde's deal was his deal and that he would padlock any company that refused to give credit life insurance business to United Security Life Insurance. The conspirators set a figure of $75,000 as the price Aspinwall should pay for a "package deal". The package Aspinwall was forced to buy amounted to this: In exchange for $75,000, Aspinwall received advance approval of the public issue of stock of Aspinwall Associates; help in obtaining a national bank charter; no difficulty concerning licensing of salesmen; and no trouble from the Attorney General's office.

The evidence showed that Flowers directly benefitted from some of the schemes. Shortly after one victim had paid $2500 to Pan-American Public Relations and Advertising, a sham Florida public relations company, a check from the company for the same amount was deposited in Flowers's personal bank account. Paramount Life Insurance Company of Alabama, a subsidiary of an Arkansas company, had difficulty securing approval of a public issue of the sale of stock. Gantt notified the company's attorney that approval of the stock registration might take a year. Hyde set a price of $25,000 to secure approval. Paramount paid the money by checks made out to an attorney selected by Hyde. The first pay-off, $10,000, was sent to Hyde's office; the attorney endorsed the check for deposit and then signed a check drawn on this account to the Richmond Flowers Campaign Committee in the amount of $8,000. At Hyde's direction, the company paid two additional amounts of $5,000 each to other persons. He described one of these payments as a "flat lay-off". The company secured approval for its stock issue within 48 hours after agreeing to make the $25,000 payment. The evidence also showed that part of the money extorted from First American

Life Insurance Company included a mortgage loan of $50,000 for Kelly to buy Hyde's house in Florida for Flowers's use.

On appeal the defendants do not contest the sufficiency of the evidence except in the following respects. They assert that the evidence shows at worst that their actions constituted bribery rather than extortion under the Hobbs Act. They contest the sufficiency of the evidence to show that their actions affected interstate commerce under the Hobbs Act. Gantt contests the sufficiency of the evidence to show his participation in the alleged extortion.

The issues on appeal will be discussed in the following order:

 I. Composition of Grand and Petit Juries

 II. Flowers's Motion for Severance

 III. Extortion or Bribery

 IV. Interstate Commerce: Evidence, Variance from Indictment, and Charge to Jury

 V. Gantt's guilt

 VI. Motion for Continuance Based on Kelly's Illness and Severance

 VII. Admission of Testimony to Show State of Victims' Minds

 VIII. Improper Statements in the Trial

 IX. Prejudicial Newspaper Publicity

## I. COMPOSITION OF GRAND AND PETIT JURIES

■ The defendants contend that the grand jury which returned the indictment and the trial jury which returned the verdict were illegally constituted in that they were not drawn from a pool, master jury wheel, representing a cross-section of the community; they assert that blacks and women were discriminatorily excluded from the jury system. They argue also that the court erred in denying them hearings in which to challenge the composition of the juries.

■ The grand jury of the District Court for the Northern District of Alabama indicted the defendants in this case August 2, 1968, that is, before the effective date of the Jury Service and Selection Act of 1968, 28 U.S.C. § 1861 et seq. According to the 1960 census, 79.2 percent of the adult population of the Northern District of Alabama at that time was white, and 20.8 percent black. 47.4 percent of the population was male, and 52.6 percent female. The grand jury that indicted the defendants was composed only of men, and only three of the twenty-one men were blacks.

■ The record shrieks the lack of extensive factual statistical evidence usually presented in cases involving an alleged systematic exclusion of blacks from the jury system[5] (unless a case presents systematic discrimination obvious from the total or virtually total exclusion of blacks).[6] Instead, the defendants rely on uncertain conclusions drawn from two last-minute depositions, one from Clerk of Court Davis and one from a deputy, Jones. As the defendants translated the clerks' guesses into percentages, Davis estimated that blacks composed 6.1 percent of jurors; Jones estimated 10 percent. Davis estimated that women composed 7.4 percent of jurors; Jones estimated 20 percent. Contrasting these estimates with the state 1960 census figures showing the population to be 20.8 percent black and 52 percent female, the defendants contend that blacks and women (See White v. Crook, M.D.Ala.1966, 251 F.Supp. 401) were discriminatorily excluded from the jury system in the district.[7]

---

5. For example, Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34.

6. For example, Patton v. State of Mississippi, 1947, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 96; Norris v. State of Alabama, 1934, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074.

7. No specialized showing of standing is necessary for a defendant to challenge jury composition as illegal under the federal jury statutes. Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34, 37, n. 1. As to constitutional attacks, defendants urge their standing on the

In the Northern District of Alabama, at the time this case was tried and before the 1968 Jury Act went into effect, the Clerk of Court, under the supervision of the Chief Judge, attempted to establish a fair cross-section system for selecting jurors. In 1963 the Clerk wrote to 1754 persons (so-called "key men" or "nominators") asking for suggestions for jurors.[8] These nominators suggested 18,715 names. The Clerk then sent questionnaires to the 18,715 named. The questionnaires had no inquiries about race, but did call for information on the sex of the prospective jurors. Approximately 11,000 questionnaires were returned. The clerks pared this group down to 7,000 qualified jurors, excluding those who fell within one of the explicit statutory exclusions and also those who fell within certain categories established by the district judge.[9] These 7,000 names were then combined with another 7,000 names left from the jury list compiled in 1959. From these 14,000 names the Jury Commissioner selected the final list of 6,000 by choosing at random the number of jurors from each of the 31 counties in the district, reflecting the proportion of the county's population to that of the district.[10] The Commissioner allocated jurors to each county in four broad categories—bankers, farmers, merchants, and others—in accordance with the ratio of each category to the total population in the county.[11] From this list of 6,000 names the grand jury and petit jury venires were selected by lot. In the order denying the motions to dismiss the indictment, the court distin-

ground that Flowers, the best known of them, as Attorney General prosecuted the alleged murderers of civil rights workers and appealed for Negro votes in his campaign for governor. No argument is made as to standing to challenge any underrepresentation of women.

8. The text of the letter to the jury nominators was as follows:

I am faced with the very important task of filling the jury box for the Northern District of Alabama with names from the thirty-one counties in this district, without regard to race, creed, sex, or politics, and in this task I am seeking your help.

I am enclosing a few blank sheets for your convenience, together with a statement of qualifications for jurors in this court. I shall be grateful if you will send me the names of men and women in your organization, and others, whom you think would make good jurors.

I know that you will give this matter your very careful consideration, and select only such men and women as you would want to pass on a case involving your life, liberty or property. I feel confident that your interest in good government and in equal and impartial justice will cause you to take the time to furnish names of good prospective jurors.

9. The clerks excluded at this point in the process those who fell within the statutory exclusions (physical disability, language disability, criminal conviction) plus those that the judge had orally instructed them to disqualify. Davis deposed:

"[U]nder oral instructions of the judge under that particular statute that we were instructed to excuse those persons over sixty-five years of age, those women with small children or hardships, a one man business and those with seasonal occupations. Teachers, if they ask to be excused under that particular statute. Persons travelling most of the time, ministers, lawyers, undertakers, druggists, doctors and nurses and those who have a record of hardship excuses."

10. The method of selecting juries in the Northern District is also referred to in Atlas Roofing Mfg. Co. v. Parnell, 5 Cir. 1969, 409 F.2d 1191; Jackson v. Morrow, 5 Cir. 1968, 404 F.2d 903, and descriptive information appears in the Clerk's response to a questionnaire appearing in Federal Jury Selection, Hearings Before the Subcomm. on Improvements in Judiciary, 90th Cong. 1st Sess. 741-52 (1967).

11. The defendants challenge the clerks' use of the four categories "bankers, merchants, farmers and others" as excluding Negroes and women. Gantt's brief points out the percentage of each occupational group that was purposefully included in the jury list: bankers, 3.2 per cent; merchants, 9.8 per cent; farmers, 8.4 per cent; and others, 78.6 per cent. It cannot be said that this is a discriminatory breakdown without any showing of population composition by the defendant or showing of the impact on other groups.

guished the jury selection system in its district from the system usually described as the "key men" system:

> While this terminology ["key men"] may be correct, the court is of the opinion that the so-called keyman or nominator system as used in this district in the filling of the jury box in 1963 does not fall within the factual situation, also described as a keyman system, which was discussed in great length by the United States Court of Appeals for the Fifth Circuit in Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34. ¶ * * * Every segment of society was represented both in the nominating procedure and in the final selection process. The court both judicially and personally knows that prospective jurors have been selected without regard to race, creed, color, sex, or political affiliation and that the grand and petit juries drawn from the box which was filled as aforesaid represented a reasonable cross section of the community without regard to race, creed, sex, color, or political affiliation.

A fair-minded person would have to conclude that whatever shortcomings this system of jury selection may have in terms of the end result, it cannot be said that it was systematically designed to exclude blacks and women. A description of the system—about all the record shows—falls short of a prima facie showing of intentional discrimination. "The evil [in an inadequate jury system] lies in the * * * systematic and intentional exclusion" of an "eligible class or group in the community in disregard of the prescribed standards of jury selection." Ballard v. United States, 1946, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181.

In Jackson v. Morrow, 5 Cir. 1967, 404 F.2d 903, a civil action by blacks against white police officers, the plaintiffs-appellants attacked the jury selection system in the very district where the instant case was tried, the Northern District of Alabama. The venire was composed of 39 persons, 36 whites and three blacks; 37 men and two women. Chief Judge Brown, for the Court, held that "unlike Rabinowitz" the plaintiffs failed to make an "adequate showing" that the jury box was "spectacularly" not a cross-section of the community. The showing of systematic, purposeful exclusion of blacks and women is no more adequate in the case now before the Court than it was in Jackson v. Morrow.

We discuss below the jury discrimination arguments raised by the appellants.

A. Anyone would have to say that the figures the clerks gave for the proportion of blacks and women serving on juries are uncertain indicators of the fairness of the jury selection system in the district. The clerks were hesitant to state from recollection the number or percentage of jurors falling in the two categories. Clerk Jones, who had the closest contact with the jurors, estimated the percentage representation of blacks and women at ten percent and twenty percent respectively.

In jury discrimination cases the focus is on the composition of the jury box or master jury wheel rather than on the individual jury.[12] But the defendants have made no showing of the composition of the jury box: it cannot be extrapolated from the numbers given in the clerks' depositions. Both clerks' answers to questions of the defense attorneys indicated confusion whether the numbers they gave showed the blacks and females whose names were in the jury box or those who were on the venire lists or those who had appeared in response to the call of the venires or those who actually sat on juries. The composition of the jury box cannot be decided from that of the veniremen appearing or jurors actually serving. Many of those summoned wrote asking to be excused or simply did not appear in court. The de-

---

12. See Gewin, The Jury Selection and Service Act of 1968: Implementation in the Fifth Circuit Court of Appeals, 20 Mercer L.Rev. 347, 372 (1969).

fendants made no effort to show the composition of the non-appearing portion of the venires. It is not unlikely that poor Negroes and women with small children would form a disproportionately large part of this group. As Judge Brown said in Jackson v. Morrow, 404 F.2d at 906:

All we have here is testimony concerning the number of white males, Negroes, and women of both races on the typical or average venire (see note 2, supra) summoned for the week of case. This is clearly a long way from establishing the make-up of the larger source—the jury box of 6,000 names. The venire was what remained after all excuses had been allowed. These incuded—to a liberal extent on the Judge's own unchallenged word stated into the record—women with family responsibilities. Included also were the traditional individual mileage and hardship excuses which would encompass laborers, many of whom are Negroes. There is thus a total gap which makes it unsafe—either statistically or judicially—to draw inferences on mathematical probabilities using the venire result as both the starting and ending point.

B. In jury composition cases courts tend to avoid setting precise numerical or percentage requirements reflecting a cross-section of the community. This is true of both constitutional cases (see Swain v. Alabama, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1, 22 n. 40, cert. denied, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135; Billingsley v. Clayton, 5 Cir. 1966, 359 F.2d 13, 15–18, cert. denied, 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed. 2d 74) and cases based on the former federal jury act (see Hunt v. United States, 5 Cir. 1968, 400 F.2d 306, cert. denied 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566). A jury system exactly reflecting the black-white population of

a community could be helter-skelter on the basis of economic, educational, social, and job-status representation.

Consistent with this approach *and in the absence of a prima facie showing of systematic exclusion of a cognizable group*, the cases have tended to rely on the purposes and standards of the jury selectors: Have jury commissioners intentionally excluded cognizable groups?

■■ This Court has had wide experience in cases dealing with the systematic exclusion of Negroes from juries. When there is a complete absence or "spectacular" underrepresentation of Negroes on juries, the courts have read the figures as establishing a prima facie case of purposeful discrimination on the theory that discrimination against Negroes is the most reasonable explanation for the composition of the jury system under scrutiny.[13] In such cases, the federal government or the state, as the case may be, has the burden of overcoming the prima facie case by showing no deliberate or systematic exclusion or discrimination. In each case the court considers whether the record shows that the jury selectors operate in a brazenly anti-Negro manner, as for example, by asserting that few Negroes meet the moral qualifications for jury service. *See* Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34. The court scrutinizes the method employed to determine if there is a lack of concern for achieving a cross-section of the community. For example, did the white jury commissioners or key men restrict the selection to their personal acquaintances, also all white, and make little or no effort to gain knowledge of any qualified Negroes? *See* Cassell v. Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Witcher v. Peyton, 4 Cir. 1969, 405 F.2d 725.

Conversely, when courts have found neither complete exclusion nor mere token inclusion but rather serious under-

---

13. Thus in Whitus v. Georgia, 1967, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599, the Court found that, where 42 per cent of the adult population of the county was black and 27 per cent of the taxpayers were black, a prima facie case of purposeful discrimination was made by showing that 9.1 per cent of the grand jury venire and 7.8 per cent of the petit jury venire was black.

representation they have in several cases relied on good purpose and non-discriminatory explanations in finding jury systems non-discriminatory. This has been true both as a constitutional standard and as a federal statutory standard under the former federal jury statute. The Supreme Court followed this pattern in Swain v. Alabama, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. There the Court found that the jury system of Talladega County was not tainted with illegality despite the fact that Negroes constituted only 10–15 per cent of the petit jury panels drawn from the box while they constituted 26 per cent of the adult male population. In reaching this conclusion the Court relied heavily on two factors. First, the jury commissioners did not restrict their selection to personal acquaintances, nor did they express any view that Negroes were less fit for jury service. In fact they were unaware of the race of the individuals whose names appeared on the list of jurors and did not know the number of Negroes in their beats. They sought names from various sources. They had business contacts with Negroes and were familiar in general with white and Negro members of the community. They relied on membership lists of biracial organizations. Second, the Court pointed out that there was no "meaningful attempt to demonstrate that the same proportion of Negroes qualified under the standards being administered by the commissioners." 380 U.S. at 209, 85 S.Ct. at 830.

This Court also adopted such an approach in Hunt v. United States, 5 Cir. 1968, 400 F.2d 306, which considered a challenge to a petit jury panel as violative of the federal statutory scheme. The evidence showed that although Mexican-Americans constituted 35 per cent of the population, they constituted only 17.5 per cent of the jury pool. The Court there found persuasive two findings. First, the jury selectors, the clerk and commissioner, had made deliberate efforts to obtain names of Mexican-Americans for the jury box. They understood that it was their duty to obtain a cross-section of the community. Second, evidence showed that lower educational attainments of the Mexican-American population was a non-discriminatory explanation for much of the disproportion.

■ Under these criteria the sparse evidence here produced by the defendants does not show an invalid system. As in Swain, the underrepresentation of Negroes does not per se amount to "purposeful discrimination based on race alone." 380 U.S. at 208, 85 S.Ct. at 829. The defendants have shown neither a selection system insensitive to the need for a cross-section of the community nor the absence of non-discriminatory factors to explain the disproportion.[14]

■ C. The defendants have alleged that the key man system of jury selection is inherently biased because the key men are "the leaders of the white male community," tend to recommend their friends and acquaintances, and therefore the people they recommend are as unrepresentative as they. But although the names of the key men relied on in 1963 were available, the defendants made no factual study of the composition of that group to support their general assertions. Contrary to the defendants' assertions, the court clerks in their depositions pointed out that among those selected as jury nominators were members of Negro teachers' organizations, Negro VFW posts, and organized labor which included both skilled and common laborers.[15] The

14. The defendant always has the burden of showing jury discrimination. Evidence of "spectacular" underrepresentation meets the burden, making a prima facie case of discrimination. The burden of going forward then shifts to the government to explain the figures in a non-discriminatory way.

15. The district court noted:
"These inquiries were directed to persons representing the following organizations: American Legion; V.F.W.; civic and fraternal organizations; labor organizations; Masonic lodges; bankers; judges of probate; county superintendants of education; city superin-

clerks also made efforts to obtain names from women's organizations. The clerks testified that in choosing the key men an effort was made to get a cross-section.

The letter that the clerks sent to the 1754 key men requested their assistance in "filling the jury box * * * without regard to race, creed, sex, or politics * * *" And although jury questionnaires sent to those suggested did request information as to the individual's sex, no information concerning race was sought or recorded in any way.

█ Non-discriminatory factors having nothing to do with the use of key men might explain a disproportion in the jury lists. The disproportion might have occurred, or it might have been accentuated, at two steps in the winnowing process. First, of the 18,700 to whom questionnaires were sent, only 11,000 returned them. Second, the clerks, on the basis of the questionnaires, determined that only 7,000 were qualified. At either step Negroes and women might easily have dropped out disproportionately but in a non-discriminatory fashion.[16]

█ D. The defendants allege that they were improperly denied a hearing on the issue of grand jury composition. We cannot agree.

The indictment was returned in August 1968. September 16, 1968, Flowers moved to dismiss the indictment because of improper composition of the grand jury. November 20 Flowers's attorney filed a motion for a hearing on the grand jury issue. It was not until January 20, 1969, just one week before the trial was scheduled to—and in fact did—begin, that defense attorneys began discovery, that is, took the depositions of the two court clerks on the issue of grand jury composition.

Defense counsel say, "Although the Clerk's discovery deposition was taken, producing some raw data, this did not enter into the district court's decision". The colloquy that occurred between the defense counsel and the trial court shows that the depositions were put in evidence. Moreover, the clerk's stamp on the depositions show that they were filed on January 22, 1969. The trial judge therefore had the benefit of the transcribed depositions before he entered his order of dismissal January 23, 1969. The trial judge stated that he had "no objection, as far as the Court is concerned to putting it all in the record". There is no basis for the defendants' assumption that the trial judge did not consider the evidence brought out in their depositions.

This case is unlike either Mobley v. United States, 5 Cir. 1968, 379 F.2d 768, or Scott v. Walker, 5 Cir. 1968, 358 F.2d 561, heavily relied on by the appellants. In *Mobley* the trial judge denied the defendant access to questionnaires on file that would have helped to determine the racial composition of the list from which his grand and petit juries were drawn. This Court reversed the denial of access

tendants of education; Jeanes teachers and special supervisors; county boards of revenue; county agents, home demonstration agents; agriculture stabilization and conservation service officers."

16. Labat v. Bennett, 5 Cir. 1966, 365 F.2d 698, does not require that all neutral criteria which tend to represent some groups less than others be abandoned. What concerned the Court in *Labat* was that use of the supposedly neutral criterion resulted, with other factors, in a total exclusion of Negroes from juries. Nor does the fact that a system based on voluntary return of questionnaires tends to underrepresent some groups necessarily taint the jury under the *Labat* decision. In both *Labat* and Thiel v. South-

ern Pacific Co., 1946, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, not only was the result the exclusion of a very large portion of certain groups but it was effectuated by the jury commissioner's conscious policy of excluding groups from the jury lists. Voluntary non-participation is distinguishable. See Grimes v. United States, 5 Cir. 1968, 391 F.2d 709.

Contrary to the defendants' suggestion, the fact that the new jury statute does impose a duty on jurors to answer questionnaires and does empower courts to require potential jurors to appear to answer questionnaires does not indicate that failure to pursue unanswered questionnaires was illegal under the former statute.

828

and remanded for a hearing on the jury issue. In *Scott v. Walker* an investigator working for the defendant was denied access to official records in his attempt to determine the composition of jury lists. The court was therefore more willing to rely on the testimony of jury selection officials as to the composition of the jury lists in reversing the conviction. That testimony was sufficient to make a prima facie case of purposeful jury discrimination.[17]

In this case the defendants were not denied access to any of the records retained by the clerk's office. Yet they filed no affidavits with their motions and they failed to make a timely or detailed study based on the records. Indeed, the trial court delayed a decision on the motion to quash at the request of defense counsel because they "had not had time to take the depositions". The defendants had full opportunity to depose officials responsible for the jury selection. Appellants were not denied their right to a hearing.

E. Defendants also argue that the jury suggester system in the Northern District of Alabama was per se illegal under Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34. Rabinowitz did not declare the key man system illegal per se. *See* Mobley v. United States, *supra*; Hunt v. United States, *supra*. Rather, Rabinowitz turned on a showing of a great underrepresentation of Negroes on the jury lists due to highly subjective standards used by the small group of jury commissioners and grossly inadequate sources of names.[18]

If not illegal per se, the defendants argue, use of a key man system is so suspect that it shifts to the state the burden of proving that Negroes and other identifiable groups were not underrepresented. Here the defendants attempt to convert a burden of explanation that the government has when it is shown that jury composition is spectacularly disproportionate into a burden of statistical analysis whenever general allegations of discrimination are made. We cannot agree with this broad proposition.

F. The defendants also contend that the jury selection system was rendered illegal under *Rabinowitz* by the inclusion in the letter to the key men of the following sentence: "I know that you will give this matter your very careful consideration, and select only such men and women as you would want to pass on a case involving your life, liberty or property." For text of entire letter, see note 8.

The Supreme Court has said that such a standard is not on its face unconstitutional. Carter v. Jury Commissioner, 1970, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed. 2d 549; Turner v. Fouche, 1970, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567. Nor is the inclusion of such extra-statutory standards in jury selection criteria for federal district courts per se illegal under the former jury selection statute despite language in the majority opinion in *Rabinowitz*.[19] No court in this circuit has held that the use of such standards is illegal in the absence of a showing, such as that made in *Rabinowitz*, that highly subjective standards were used by a small group of official jury selectors who made little or no effort to obtain a fair cross-section of the community and that the result was gross underrepresentation of Negroes in the jury system. This Court has several times refused to reverse judgments where similar extra-statutory standards

17. The court found that despite the fact that 13 per cent of the adult population was Negro, no more than 1 per cent of those of the jury list were Negro. This was found to be token inclusion. The court noted that selection by the commissioners was based on personal acquaintance.

18. In Rabinowitz, although 34.5 per cent of the adult population was Negro, only

5.9 per cent of the jury list of almost 2,000 names was Negro.

19. A majority of the en banc court voted for Judge Rives's opinion, but Judge Brown's concurring opinion made clear that he disagreed with Judge Rives's views of the illegality of any specification of standards beyond those enumerated in the statute. *See* Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34, 72.

were used in the selection of federal juries. *See* Jackson v. Morrow, 5 Cir. 1968, 404 F.2d 903, 906, n. 5 (same jury lists in the Northern District of Alabama); Hunt v. United States, *supra* ("a prospective juror should be esteemed in his community as a person of good character, approved integrity, sound judgment and fair education").

If the challenged statement in the letter stood alone and if we could make the violent assumption that the key men were all upper-or-middle-class whites, the challenged statement might be unfair because of its apparently having been addressed to the interests of the key men rather than to those of the community. But the statement must be considered in the light of the letter as a whole and in conjunction with the admonition that the jury list was to be compiled "without regard to race, creed, sex, or politics." Moreover, the key men who were sent these letters were themselves, according to the clerks' depositions, representative of a cross-section of the community.

█ G. The petit jury for the defendants' trial was selected according to the plan of the district court for the Northern District of Alabama, adopted pursuant to the Jury Selection and Service Act of 1968 and approved by the Fifth Circuit Judicial Council.[20] After finding that voter registration lists "represent a fair cross section of the community in the Northern District of Alabama" the Council determined that jury selection should be based solely on voter registration list. The plan also established certain categories of people who would be excused on individual request and other categories who were exempt altogether from jury service.[21]

The first day of trial the defendants moved to challenge the array and to quash the venire from which their petit jury was to be drawn. The ground for challenge was that the venire was not representative of a cross-section of the community solely because of the excuses and exemptions established in the jury selection plan. The district court denied the motion.

On appeal, the defendants raise two points with regard to the petit jury. First, they allege that the court erred in summarily denying the motion because they were entitled to present testimony to the court in support of the motion under 28 U.S.C. § 1867(d). This section provides that when defendants allege facts that

> * * * if true, would constitute a substantial failure to comply with the provisions of this title, the moving

20. See Gewin, The Jury Selection and Service Act of 1968: Implementation in the Fifth Circuit Court of Appeals, 20 Mercer L.Rev. 347, 372 (1969).

21. The plan contained the following excused and exempt categories:
 (1) excused on request,
 1. Persons over 65 years of age.
 2. Actively engaged members of the clergy.
 3. Women who have legal custody of a child or children under the age of 10 years.
 4. Actively practicing attorneys, physicians, dentists, registered nurses, and druggists.
 5. Persons who have served as grand or petit juror in a state or federal court within the past two years.
 6. Clerks and deputy clerks of any state or federal court of record.
 and, (2) exemptions,

 1. Members in active service in the Armed Forces of the United States.
 2. Members of the fire or police departments of any state, district, territory, possession or subdivision thereof.
 3. Public officers in the executive, legislative, or judicial branches of the Government of the United States, or any state, district, territory or possession or subdivision thereof, who are actively engaged in the performance of official duties. Public officer shall mean a person who is either elected to public office or who is directly appointed by a person elected to public office.
 4. Persons over 70 years of age at the time of executing the juror qualification form.
 The language of exemptions 1–3 is taken from the statute.

party shall be entitled to present in support of such motions the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence.

It is not clear that the trial judge did deny a request for a hearing; he stated that at a later point he was willing to allow the defendants to put on testimony, particularly that of Clerk Jones "who would know" the facts defense counsel wanted to bring out for the record. Even assuming that this might constitute a summary denial, there were no facts in the allegation that if true would show the venire to have been illegally constituted. The plan provided for reasonable categories for excuses and exemptions. In fact, three of the four categories of exemptions that the defendant challenged were established by Congress in the statute. 28 U.S.C. § 1863(b) (6).

Second, defendants allege that the plan under which the jury was chosen was defective because its reliance on voter registration lists [22] produced an underrepresentation of blacks. The statute prescribes voter lists as the sole source for names unless other sources are needed as supplements to achieve a fair cross-section of the community. 18 U.S.C. § 1863(b) (2). The defendants argue that the voter lists are not a sufficient source for the jury list here because, although 88 per cent of the 850,071 white adults are registered to vote, only 54.5 per cent of the 220,282 Negro adults are registered in the district.

This ground of objection to the venire was not brought up at the trial, either in the written motion or in the oral statement. The Act under which the plan was promulgated stipulates that objection at the beginning of the trial is the exclusive means by which a defendant may challenge a jury "on the ground that such jury was not selected in conformity with the provisions of the title." 28 U.S.C. § 1867(e). Thus the defendants have foregone any opportunity to challenge the racial composition of the jury venire on statutory grounds.

The attempt of the defendants to raise constitutional objections to the reliance on voter lists also falls victim to F.R. Crim.P. 51, which requires that a defendant make known to the court his objections and the grounds therefor. Although the defendants did object to the venire, they made no objection to basing the jury lists solely on voter lists, Therefore this Court cannot consider the issue unless it amounts to plain error. See Landers v. United States, 5 Cir. 1962, 304 F.2d 577; Wright, Federal Practice and Procedure § 843.

This contention does not rise to the level of plain error. Using the voting rolls, on the basis of the appellants' figures, blacks would constitute 14 per cent of the source of the random selection for the jury lists while they constitute 20 per cent of the adult population of the district. On the facts of this case, such a disparity does not reflect unconstitutional discrimination against blacks. The underrepresentation is certainly not so great as to give blacks mere token inclusion. Nor can it be said that there was a purpose to exclude blacks. The primary reliance on voting rolls was prescribed by Congress as the best way, in most cases, to achieve jury lists containing fair cross-sections of the community.[23] Congress, under the Vot-

22. See Gewin, The Jury Selection and Service Act of 1968: Implementation in the Fifth Circuit Court of Appeals, 20 Mercer L.Rev. 347, 372 (1969).

23. There is some indication that the district judge may have thought the approval of the Fifth Circuit Judicial Council automatically validated the jury selection plan, implying that a party could not challenge a plan in district court after the Council approved it.

Any such conclusion would be erroneous. The statute itself refers to the procedure by which a defendant or a party to an action may attack the validity of the plan, thereby making such an attack proper. 28 U.S.C. § 1867. Grave constitutional questions would arise from any effort to

ing Rights Act of 1965, had previously acted to ensure that voting rolls in the South are open to all who desire to vote, despite historical discrimination against Negroes.

In sum, we hold that the defendants failed to show a purposeful, systematic exclusion of blacks and women from the jury system in the Northern District of Alabama at the time of the defendants' trial.

## II. FLOWERS' MOTION FOR SEVERANCE

Flowers contends that he should have been granted a severance of trial. This contention is grounded on an asserted right to comment on the failure of his co-defendants to testify, as this Court discussed in De Luna v. United States, 5 Cir. 1962, 308 F.2d 140 (Wisdom, J.).[24] We hold that the De Luna dilemma is absent here.

Flowers's defense rests on the theory that (1) no crime occurred (2) and if Hyde and Gantt were acting criminally, *he* was not involved in the crime. He argues that he "had a right to avail himself of every legal inference of innocence available to him, including the guilt of others." Flowers's attorney argued to the trial judge that he wanted to point out the co-defendants' failure

to testify in order to highlight the guilt of the others and to stress that Flowers had the "honesty, integrity and courage in his belief that the was innocent of any criminal offense to take the stand * * *."

This contention shows a misunderstanding of the reasons that led the Court in *de Luna* to recognize the right of one defendant *in certain circumstances* to comment on the failure of a co-defendant to testify.[25] In that case two men were tried for possession of drugs. They had been arrested in an automobile immediately after one of them, Gomez, had tossed a package of drugs out of the car window. The theory of each defendant at the trial was that only the other defendant was guilty of possession. de Luna, who did not testify, relied on the theory that he had never possessed the drugs. Gomez took the stand and testified that the package was exclusively de Luna's and that when de Luna saw the police he handed the package to Gomez and told him to toss it out the window. In closing arguments, Gomez's attorney, in an effort to bolster the theory that his client was the innocent one, commented on de Luna's failure to take the stand.

In de Luna we referred to "an attorney's duty to his client * * * to draw the jury's attention to the possible

---

substitute prior Judicial Council approval for judicial determination of the issue in a live case presented by adversary parties.

24. In *De Luna*, the first defendant, whose attorney commented on the second defendant's failure to testify, was acquitted. The second was convicted. This Court had on appeal only the conviction of the second, which it reversed. The actual holding in the case was that the comment of the co-defendant's attorney on de Luna's failure to testify violated de Luna's Fifth Amendment right to remain silent. A majority of the Court felt that in certain cases involving "the head-on collision between two defendants" a defendant's attorney would have a duty to comment on a co-defendant's failure to testify and that in such a case the trial judge should grant a severance so that the right of one defendant to draw the inference of the other's guilt would not inter-

fere with the right of the other not to testify in his own defense.

25. No court has reversed a conviction on the basis of the *De Luna* right to comment, in a separate trial, on the failure of another to testify. *See* Wright, Federal Practice and Procedure § 225 at p. 461 (1969). Usually the court finds that the defenses are not such that any helpful rational inference in favor of one could be drawn from the other's silence. *See, e. g.,* United States v. Kahn, 7 Cir. 1967, 381 F.2d 824, cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661. Other courts have disagreed with the right to comment even in the *De Luna* situation. See United States v. Marquez, S.D.N.Y. 1970, 319 F.Supp. 1016, (Weinfeld, J.) (assertion of privilege carries no implication of guilt and is therefore without probative value).

inference of guilt from de Luna's fail-silence * * * [as] integral to Gomez's defense." 308 F.2d at 141, 143. We recognized Gomez's right to draw the inference of guilt from de Luna's failure to testify only because the entire trial had developed on the theory of mutually exclusive guilt: either Gomez or de Luna was guilty, but not both of them. To show de Luna guilty would therefore exonerate Gomez.

■ Flowers's defense in this case could not rationally profit from showing the guilt of Hyde and Gantt. These defendants were interlocking parts of a whole. There were no mutually exclusive theories of guilt in the case. Flowers's main defense theory was that no crime had been committed by any of the defendants. Showing that Hyde and Gantt were guilty gives no support to this position. Flowers's second defense theory was that even if Hyde and Gantt were guilty he was not involved. But proving Hyde and Gantt guilty did not support this theory. Their guilt was not inconsistent with his innocence, but it gave no assistance to proving innocence.[26]

### III. EXTORTION or BRIBERY?

■ On appeal the defendants in effect concede that operators of life insurance companies and loan companies made payments to the defendants to influence the Attorney General's regulation of their businesses. But, they ask, "[w]ere the alleged victims extorted from or were they willing participants in an attempt to bribe?" We hold that although there may have been some bribery, there was sufficient evidence to allow the jury to convict these defendants of extortion.

The defendants argue that the "victims" were shady operators and that therefore any payments to avoid the just actions of the Attorney General's office must be bribery rather than extortion. The argument relies on the reasoning that extortion occurs only when a legal right is threatened, that shady operators have no legal right to stay in business, and that therefore there was no extortive threat in this case. Assuming that some or all of the companies making payments were engaged in practices for which the Attorney General's office might properly have prosecuted or closed their offices, the conclusion that payments must be bribery does not follow.

■ Threatening to take official action—even where it is action that the official is duty-bound to take—for the purpose of coercing the victim to pay the official is extortion. See United States v. Sopher, 7 Cir. 1966, 362 F.2d 523, cert. denied, 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210.

The language of the statute makes clear that the actions of officials may constitute extortion:

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, vio-

---

26. In his pre-trial motion for severance, Flowers asserted that his co-defendants could give exculpatory evidence and that they would be unwilling to do so as co-defendants. He does not on appeal assert this contention as a basis for a right to severance. Even if he had, it would be of little avail. The trial judge has discretion in determining whether to grant a severance. Smith v. United States, 5 Cir. 1967, 385 F.2d 34. Because of this discretion and the advantage of a joint trial in certain cases, United States v. Kahn, 7 Cir. 1967, 381 F.2d 824, 840, a defendant must clearly show prejudice to require reversal on the basis of a failure to sever. A number of courts have held that the mere unsupported allegation that a co-defendant would be more likely to give exculpatory testimony at a separate trial is not grounds for a finding of such prejudice. E. g. Smith v. United States, 5 Cir. 1967, 385 F.2d 34; United States v. Kahn, 7 Cir. 1967, 381 F.2d 824 at 841. In one of the few cases reversing a conviction on this ground, there was strong reason to believe that exculpatory testimony would be forthcoming from the co-defendant in a separate trial: the second defendant had three times in open court in a prior proceeding exonerated the one seeking the severance. United States v. Echeles, 7 Cir. 1965, 352 F.2d 892.

lence, or fear, or under color of official right.

18 U.S.C. § 1951(b) (2). The language is consistent with an interpretation that the wrongful use of an official right may be a basis for extortion. Yet it does not explicitly answer the question whether extortion includes threatening to do what the official has a duty to do.

In the Model Penal Code commentary such action is within the Code's definition of extortion.[27] And the application of the Hobbs Act in the area to which it was primarily directed—labor relations—makes clear that this is extortion. For instance, although an employer has no absolute right to labor tranquility and a labor leader has a right to organize strikes and pickets for certain purposes, it is extortion for a union leader to threaten an employer with labor troubles in order to coerce payments. E. g. United States v. Kramer, 7 Cir. 1966, 355 F. 2d 891, cert. denied in part and granted in part, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396, cf. People v. Dioguardi, 1960, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 880, 168 N.E.2d 683.

■■■ It is the wrongful use of an otherwise valid power that converts dutiful action into extortion. If the purpose and effect are to intimidate others, forcing them to pay, the action constitutes extortion. Put another way, it is the right to impartial determination of the issue on the merits (i. e. whether to enforce the law or whether to picket or strike) that the victim is deprived of when these actions are taken for the purpose of coercing him into paying. The distinction from bribery is therefore the initiative and purpose on the part of the official and the fear and lack of voluntariness on the part of the victim.

■■ There was evidence in this case to support a finding that the defendants coerced companies into paying fees in order to avoid harmful legal action. In some cases explicit threats were made. For instance, an official of Alabama Factoring and Finance Company testified that Hyde told him that if he did not enter an agreement for payments the corporation's stock issue would not be approved by the Attorney General's office. Also, Louis Tortorigi, part owner and operator of Jeffco Finance, testified that two weeks after the company began operations Harvey Moore, an employee of Hyde,[28] approached him and said that he had to buy worthless credit life insurance to stay out of trouble with the Attorney General's office. According to Tortorigi, Moore called it a "shakedown". Top officials of the interested companies, such as Held of Paramount Life Insurance of Alabama and Orr of Trans-Southern testified that they learned that the Attorney General's office would not approve stock issues unless they paid Hyde.

As we previously noted, in the case of Century Discount, the Attorney Gen-

---

27. The commentary to the Model Penal Code, Tent. Draft No. 2 § 206.3 "Theft by Intimidation" (1954) (which section was included in the Proposed Official Draft of 1962 as § 223.4 "Theft by Extortion") includes the following language:

> The threatened harm need not be 'unlawful'. The actor may be privileged or even duty bound to inflict the harm which he threatens; yet if he employs the threat of harm to coerce a transfer of property for his own benefit he clearly belongs among those to whom theft sanctions should be applied. The case of the policeman who is under a duty to make an arrest illustrates the point. His threat to arrest unless the arrestee pays him money is clearly extortionate although the policeman would be derelict if he did not arrest.

And further,

> The typical case covered by subsection (8) is extortion under color of office, as where an elevator inspector or tax collector threatens to report violations which might lead to large non-criminal penalties. The offense lies close to that of bribery, and the same transaction may constitute both crimes, but if the element of intimidation be present the present section will apply.

28. Harvey Moore was named as a co-conspirator in Count Two of the indictment but was not named as a defendant.

eral's office took affirmative action to frighten Century Discount's officers into paying the defendants. This occurred when Gantt removed vital records as part of an official investigation and when Attorney General Flowers filed a suit against the company. Hyde was with the members of the Attorney General's office immediately after the seizure of the records and said to Gantt that once the investigation of the company had been launched he would take it from there, implying that this would be the basis for extortion. Brozman, the president of Century Acceptance, the parent company, testified that when he came to Alabama to see what was happening to the subsidiary, Harvey Moore suggested to him that he could be of help in his problems. Moore took Held to see Hyde, who sought a payoff.

There was also evidence supporting the finding of a general scheme on the part of the defendants to extort from these and similar companies. Indeed, as pointed out, Hyde offered a great deal of the credit life insurance business in Alabama to Aspinwall of United Security Life Insurance (USLI) in return for 25 per cent of the gross premiums. The purpose was to use USLI as the collection agent for payments from other companies. That this was part of a scheme of extortion rather than simply preparedness for widespread, spontaneous efforts to bribe is shown by Flowers's statement made at the same time. According to Aspinwall's testimony, Flowers said that any loan company that did not give USLI the credit life insurance business would be padlocked. Additionally, Jerry Coe, an attorney, testified that Hyde, in the presence of Flowers, sought to have him serve as a collection agent for the extortion in the following manner: Hyde would refer people seeking approval of stock issues to Coe and tell him what fees to charge them—the implication being that they would have to pay the fees in order to have their issue approved—and would later tell him how to distribute the money. There was also testimony from the wit-

nesses who paid that they did so because they feared financial ruin otherwise.

The defendants attack the credibility of the witnesses furnishing the above testimony. They argue that the witnesses were bribers and that in retrospect they doctored their testimony to exonerate themselves by creating a picture of extortion. The Supreme Court has said in response to very similar contentions: "[t]he short answer to this is that the credibility of a witness is a question for the jury. * * * It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 1944, 315 U.S. 60, 77–80, 62 S.Ct. 457, 468–469, 86 L.Ed. 680, 703–704. There appears no reason on this appeal to disturb the jury's fact finding.

■ The fact that relations between the victims and the extorters were often cordial is not inconsistent with extortion. Knowing that they were at the mercy of the Attorney General's office, it is a fair inference that the victims felt that to save their businesses they had to keep the extorters satisfied.

The evidence the government presented with respect to some of the payments made no explicit reference to threats or coercion. The jury could infer that these people knew of the general pattern of extortion and sought out Hyde with the knowledge that they would have to deal with him eventually in order to get their issues approved. Even if these persons were not coerced, that is, they were willing bribers, the jury could find that other payments were made by victims coerced into paying extortion.

## IV. INTERSTATE COMMERCE: EVIDENCE, VARIANCE FROM INDICTMENT AND CHARGE TO JURY

### A. Sufficiency of Evidence

■ The Hobbs Act applies only to one who "in any way or degree obstructs,

delays, or affects" interstate commerce. 18 U.S.C. § 1951(a). The defendants urge on appeal that this jurisdictional element was not proved below. We disagree. There is evidence in the record to support the conclusion that each of the companies mentioned in the indictment was involved to some extent in interstate commerce and that the extortion sufficiently affected interstate commerce to support the exertion of federal jurisdiction under the statutory criterion.

The record shows that the following corporations—all those mentioned in the indictment—were involved in interstate commerce in the following ways: [29]

(1) Alabama Factoring and Finance Corp., as a factor, purchased from Alabama manufacturers invoices representing sales to out-of-state purchasers. Thereafter it would have to collect payments from the out-of-state purchasers. In effect, such buying of invoices represented a financing of interstate sale transactions.

(2) Aspinwall & Associates, registered with the Federal Securities and Exchange Commission, was established to, and later did, create a wholly-owned Florida subsidiary, Aspinwall Company, for the purpose of building a marina in Florida. Additionally, United Security Life Insurance Company, the corporation that paid the extortion to benefit Aspinwall & Associates, was itself in interstate commerce. Located primarily in Alabama, USLI also did business in Georgia and Mississippi. It was engaged in enough interstate activity for the SEC to order it to cease trading its stock.

(3) Paramount Life Insurance of Alabama was set up by Held and others in control of Paramount Life Insurance of Arkansas. Arkansas residents invested $130,000 in Paramount Foundation, which became the organizer of Paramount of Alabama. As an operating life insurance company, Paramount of Alabama was in interstate commerce in the following ways: it had a reinsurance agreement with a Tennessee insurance company; and Arkansas Management, a part of the corporate family of Paramount Life Insurance of Arkansas, issued the Alabama company's policies and kept its financial books, both for a fee.

(4) Trans-Southern Corp. was established with $50,000 seed capital, $15,000 of which was contributed by a resident of Colorado. Trans-Southern was conceived of as a holding company for a life insurance company and a bank. Trans-Southern Life was established and as part of its operations it had a reinsurance agreement with a Tennessee insurance company. The company acquired the bank.

(5) Century Discount Corporation was in fact twenty Alabama corporations wholly owned by Century Acceptance Corporation, a publicly owned corporation in Kansas City, Missouri. These companies were in the small loan business. The subsidiaries were essentially local offices of the parent company: when they needed additional lending funds, the parent corporation would borrow in Kansas City, Chicago, New York and other cities, and forward funds to the local offices; when these offices had excess funds on hand, they would remit them to Kansas City. During the period of the conspiracy, the Alabama offices of the corporation held about $5,000,000 in receivables.

The defendants raise several objections to reliance on these facts. First they raise the corporate identity problem. For instance, they argue that the indictment refers to interstate commerce of Century Discount, whereas proof shows that Century Acceptance paid the extorted fee and that no showing was made as to which of the twenty subsidiaries in Alabama received which funds

---

29. On appeal of course we apply the familiar rule that after a verdict of guilty the evidence must be considered in the light most favorable to the government.

Glasser v. United States, 1944, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, 704; Gilliland v. United States, 5 Cir. 1967, 385 F.2d 912.

from Century Acceptance. Additionally, they point out that although the interstate commerce aspect of Aspinwall & Associates is cited in the indictment, this company paid nothing; it was United Security Life Insurance Company—controlled by the same people as Aspinwall & Associates—that paid to secure Aspinwall & Associates' registration. And they point out that the Arkansas financiers put no money into Paramount Life Insurance of Alabama, but only into Paramount Foundation Company, which in turn established and invested its funds in stock of Paramount Life Insurance of Alabama.

Such a formalistic approach cannot be used to hide the true nature of these enterprises and the effect of extortion from them. Each set of companies was in practice integrated, operating as one large enterprise. These companies were tied together in the minds of the extorters. Their impact on interstate commerce was not diminished by their division into different corporations nor was it affected by the identity of the particular corporation in each family that actually put up the funds to pay the extortion.

■ Additionally, the defendants argue that some of the companies were not engaged in interstate commerce at the time of the extortion. They say, for instance, that Alabama Factoring did not buy any invoices until several months after it paid extorted fees. And Aspinwall Company did not build its marina until a year or so after the extortion. This argument is without merit. The companies were formed, and registration for a stock sale was sought, with a stated purpose of going into the activities that support a finding of interstate commerce. Neither the statute nor the Constitution requires that the company be engaged in an interstate transaction at the moment of the extortion to support federal jurisdiction. A reasonable reading of the statutory language "in any way or degree obstructs, delays, or affects" interstate commerce is that it includes preventing the establishment of an organization that will engage in such commerce. *See* United States v. Tropiano, 2 Cir. 1969, 418 F.2d 1069, cert. denied, Grasso v. United States, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (interstate commerce requirement met by expectation of further orders of refuse trucks and containers from out of state).

■ The defendants further contend that the effect on interstate commerce was *de minimus* while the statute requires a substantial impact. What the defendants were shown to have done with respect to interstate commerce is this: having power to interfere with the continued Alabama operations of a number of companies that, although local in many ways, had significant interstate aspects, the defendants threatened the existence of the companies and extorted money from them as the price of survival. In so doing, under Count One of the indictment, the defendants threatened the existence of a company that would finance interstate sale transactions (Alabama Factoring); of a company that proposed to build a marina in another state (Aspinwall & Associates); and of two life insurance companies, one of which (Paramount) was established on the basis of a large financial contribution from Arkansas and had continuing financial relations with its sister corporation in Arkansas, and the other of which (Trans-Southern) was established partly by an out-of-state investment and had a reinsurance agreement with a Tennessee corporation. Count Three relies only on the effect on Paramount Life of Alabama. In the facts on which Counts Two and Four are based, the extorters threatened to close the local operations of an interstate small loan operation in which there was a continual interchange of money between the parent company in Missouri and the local subsidiaries.

■ These facts show sufficient impact on interstate commerce to meet the statutory requirement. The impact on interstate commerce need not be substantial, as the defendants argue. In Stirone v. United States, 1960, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252, the Supreme

Court said the Hobbs Act " * * * speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." And the Second Circuit Court of Appeals, in United States v. Tropiano, 2 Cir. 1969, 418 F.2d 1069, cert. denied, Grasso v. United States, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530, has held that " * * * extortion or threats of violence need affect interstate commerce only in a minimal degree to constitute a violation." The standard under the Hobbs Act is therefore different from that under the Sherman Act, which requires a substantial impact on interstate commerce. United States v. Malinsky, S.D.N.Y.1956, 19 F.R.D. 426.

By this standard, the jurisdiction requirement was certainly met as to Counts Two and Four on the basis of the interference with Century Acceptance and subsidiaries. Also the totality of interstate contacts under Count One was sufficient for interference with these businesses to affect interstate commerce. We

also conclude that the involvement of Paramount Life Insurance of Alabama in interstate commerce was alone sufficient for interference with it to constitute affecting interstate commerce within the meaning of the statute.

B. *Variance from the Indictment*

The defendants contend that resting a finding of jurisdictional interstate commerce on the above enumerated facts is in conflict with their Fifth Amendment right to trial only on charges brought in an indictment by a grand jury.

In Stirone v. United States, *supra* the Court voided a conviction because the district court allowed the prosecution to put into evidence and charged the jury with respect to information about an interstate aspect of the extortion victim in addition to the aspect specified in the indictment.[30] The defendants here allege that the prosecution relied on facts not charged in the indictment rather than those interstate commerce facts that the grand jury did consider and charge.[31]

30. In *Stirone,* the indictment charged that the victim, who owned a ready-mix concrete plant in Pennsylvania, "caused supplies and materials to move in interstate commerce between various points in the United States and the site of his plant for the manufacture or mixing of ready mixed concrete * * *." Over the defendant's objections, the district court allowed the government to offer evidence that interstate commerce was additionally affected because the victim had agreed to supply cement to build a steel plant that would ship its product in interstate commerce.

31. The following language is taken from the indictment:
Count One: (18 U.S.C. § 1951)
The Grand Jury Charges:
1. That all times pertinent hereto, a part of the interstate commerce of the United States has consisted of the transportation between the several states of articles and commodities including monies, debentures, stocks, bonds and other forms of securities used in the establishment and operation of life insurance companies, banks, and other financial institutions. A further part of such commerce consists of the trans-

portation between the several states of checks, accounts receivable, notes and other forms of debts and obligations.
2. That at all times pertinent hereto, the following business entities and others to the Grand Jury unknown, were doing business within the State of Alabama and were engaged in interstate commerce as described in Paragraph 1, above, to wit:
a) The Alabama Factoring and Finance Company, an Alabama corporation was established to, and did enter into business and function as, a Factor, which business included lending money, buying invoices, and purchasing materials for builders and contractors. The said customers and clients of Alabama Factoring and Finance Company had offices in, and did business in, states other than the state of Alabama.
b) The Aspinwall Associates, an Alabama corporation, was established to, and did function as, a holding company, the assets of which consisted of the stock of Aspinwall and Company. Aspinwall and Company, an Alabama corporation, was established to, and did, construct and operate a boat marina in the State of Florida.

It is true that the prosecution did not make any showing of some of the specific facts alleged in the indictment. Thus the prosecution made no attempt to show that the reserves of Paramount and Trans-Southern Life Insurance Companies were invested in securities through interstate commerce. Nor was it shown that the bank purchased by Trans-Southern Corporation had any dealings in interstate commerce. Conversely, many of the facts showing that the extortion affected interstate commerce were not specified in the indictment.[32]

Yet we do not think that this case falls within the rule of *Stirone*. These defendants' convictions are not based on facts outside the scope of the indictment, the defect in *Stirone*. The first paragraph of the indictment against these defendants describes in very broad terms the interstate commerce aspects of the

c) [withdrawn from jury's consideration]

d) The Paramount Life Insurance Company of Alabama, an Alabama corporation, was established, and did business as, an old line legal reserve life insurance company and, as such, the reserves of said company were invested in stocks, bonds and other securities. The said purchase and sale of these securities required transportation among the several states of monies, checks, records of account, and securities.

e) The Trans-Southern Corporation, an Alabama corporation, was established to, and did function as, a holding company, the assets of which in part consisted of stock ownership in the Bank of Huntsville and the Trans-Southern Life Insurance Company. The reserves of the said Trans-Southern Life Insurance Compay were invested in stocks, bonds and other forms of securities, the purchase and sale of which required the transportation among the several states of monies, checks records of account and other securities. Further, the operation of the Bank of Huntsville required the transportation of checks, currency and securities among the several states.

Count Two: (18 U.S.C. § 1951)

The Grand Jury further charges:

1. That at all times pertinent hereto, a part of the interstate commerce of the United States has consisted of the transportation between the several states of articles and commodities including monies, notes, accounts receivable, and other forms of security representing debts and obligations used in the maintenance and operation of small loan finance companies and other financial institutions.

2. That at all times pertinent hereto, the following business entities, and others to the Grand Jury unknown, were doing business within the State of Alabama, and further were engaged in interstate commerce as described above, to wit:

a) [withdrawn from jury's consideration]

b) The Century Discount Corporation, an Alabama corporation, was established to, and did do business as, a small loan and finance company, which business included lending and borrowing money and purchasing and selling debts and obligations. The Century Discount Corporation is a corporate subsidiary of the Century Acceptance Corporation, a Missouri corporation, which through its subsidiaries operates finance and loan companies in sixteen (16) states and further writes credit life, accident, health and physical damage insurance and their operations required the transportation among the several states of monies, checks, records of account and securities.

Count Three: (18 U.S.C. § 1951)

The Grand Jury further charges:

1. Paragraphs 1 and 2(d) of Count One of this Indictment are here realleged and incorporated herein as though set out in full.

2. That at all times pertinent hereto, the original incorporators of Paramount Life Insurance Company of Alabama (hereinafter referred to as Paramount of Alabama) were the principal officers and shareholders in Paramount of Arkansas with offices in Little Rock, Arkansas, and further that the said incorporators subscribed to the voting stock of Paramount of Alabama through the Arkansas Management Corporation of Little Rock.

Count Four: (18 U.S.C. § 1951)

The Grand Jury further charges:

1. Paragraphs 1 and 2(b) of Count Two of this indictment are here realleged and incorporated herein as though set out in full.

32. The proof of the interstate commerce aspect of Century Discount and Century Acceptance followed the allegations of Counts Two and Four except for minor variations.

companies involved in this case. *See* note *31, supra.* The description of the specific activities of the particular companies is introduced by language indicating that the specifics are given as examples of the broad allegations about the interstate aspects of the establishment and operations of the companies.[33] It is apparent that the indicting grand jury had in mind that the types of activities proved at the trial would constitute sufficient interstate commerce contact to meet the statutory criterion. The proof did not therefore go beyond the indictment.

██ ██ Nor is it fatal to the conviction that there was no proof supporting some of the specific interstate commerce allegations in the indictment. As long as the remaining portions of the indictment validly charge a crime, the existence of surplusage in the indictment will not affect the validity of a conviction. *See* Thomas v. United States, 5 Cir. 1967, 398 F.2d 531; United States v. Straus, 5 Cir. 1960, 283 F.2d 155.

33. Count Three incorporates the general allegations of Count One. Thus the proof of interstate commerce facts other than those specified in paragraph two of the count is still within the general charges of the grand jury indictment.

34. As Judge Rives aptly points out, "At the evidentiary stage of the trial there is nothing unique about the commerce issue as a 'jurisdictional element'". The issue does however impose a great responsibility on the trial court to proceed with caution, because interference with interstate commerce is the element of the conduct here that enabled Congress to declare that common law extortion can be a federal crime. And the words "affect interstate commerce" as used in 18 U.S.C. § 1951 require a legal conclusion based on the facts presented to the jury.

We think that the trial judge proceeded cautiously when on four occasions he used the words "if believed" to make the jury understand that it was the jury's function to determine whether the Government's allegations were true or false as to the defendants' activities relating to interstate commerce. It seems clear to us that the words "if believed" were addressed to the jury and mean "if the *jury* believed". We accept the trial judge's explanation to

## C. *Charge to the Jury*

Hyde, Flowers and Gantt further argue on appeal that the trial judge's instructions erroneously deprived the jury of its role in finding the facts regarding interstate commerce.

██ ██ All of the Hobbs Act cases agree that the court should determine whether the facts alleged meet the statutory requirement of affecting interstate commerce. *See e.g.,* Hulahan v. United States, 8 Cir. 1954, 214 F.2d 441, cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L. Ed. 675; Nick v. United States, 8 Cir. 1941, 122 F.2d 660, cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550. *But cf.* United States v. Kramer, 7 Cir. 1966, 355 F.2d 891, 900, another part vacated, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396. This approach is used rather than telling the jury in general terms what it means to affect commerce and allowing the jury to determine whether the facts meet this criterion, because this is a jurisdictional element for which the court has a great responsibility.[34] It is for the ju-

defendants' counsel that he underlined, "if believed" and "bore down on it" as plain signs that by inflection as well as by repetition he put the factual issue squarely to the jury.

The language used in the trial judge's charge is derived from Nick v. United States, 8 Cir. 1941, 122 F.2d 660, cert. denied 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550; Hulahan v. United States, 8 Cir. 1954, 214 F.2d 441, cert. denied 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675; United States v. Green, 7 Cir. 1957, 246 F.2d 155, cert. denied 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76. In *Nick*, the indictment charged extortion involving an association of movie exhibitors and other persons in St. Louis. The appellants alleged that the district court erred in stating "that if the evidence of the witnesses outlining the effect of stoppage of the motion picture industry in St. Louis is to be believed and is believed by you, the result, of course, is direct and substantial interference with or effect upon interstate commerce. * * * [The Court of Appeal held:] There is no proper basis for this criticism. *It is not for the jury to determine what is or is not interstate commerce*—that is a question of law. It is for the court to charge the jury that if certain facts covered by the evidence are shown then there is such interference.

*This is what the court stated and its statement is proper."* (Emphasis supplied) * * * In *Hulahan* the extortion involved local construction companies dependent upon interstate shipment of supplies * * *. The Court said: "The instruction of which Hulahan complains reads as follows: 'I charge you, as a matter of law, that if you believe the testimony of the Government witnesses with reference to the federal jurisdictional element of interstate commerce involved in this case, that is to say, the Government's testimony with reference to the bringing of various materials, commodities, and equipment, from out of state to the job sites in question in this federal judicial district, *then you are instructed that defendant's activities as shown by the Government's testimony, if you believe the same, did delay, obstruct and affect interstate commerce as that language is used in the statutes under which these charges are brought.* * * * We think it was for the court, and not the jury, to determine whether the Government's evidence, if believed, would bring the activities of the defendant within the statute and sustain federal jurisdiction." (Emphasis supplied). In *Green*, the court said: " * * * *Now so far as this being an interstate commerce tramway or highway or whatever we may desire to call it, if you believe the testimony of the Government witnesses,* it is unquestionably an interstate commerce highway. * * * It was clearly the function of the Court to determine whether interstate commerce was affected and whether the Court had jurisdiction under the Act." (Emphasis supplied).

In United States v. Ricciardi, 2 Cir. 1965, 357 F.2d 91; certiorari denied, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540, the Court commented on the proper allocation of duties between court and jury in determining jurisdictional questions in criminal cases brought under 29 U.S.C. § 186 as follows: "Although in both cases now before us the jurisdictional question was submitted to the jury, *the question of what activities constitute an industry affecting commerce under 29 U.S.C. 186 has almost always been regarded as a question of law for the court to decide, leaving to the jury only the determination of what activities the defendant had in fact engaged in.* [Citations omitted]. *The same allocation of functions between court and jury has also been made under the similar Hobbs Act, 18 U.S.C. 1951.* * * *" (Emphasis

supplied) Judge Learned Hand, has said: "If these were the facts, *the business was interstate as matter of law, and the question should not have been submitted to the jury;* and since nobody contested the facts, but only their legal effect, it was unnecessary for the judge to say anything on the issue." (Emphasis supplied) United States v. Compagna, 2 Cir. 1944, 146 F.2d 524, cert. denied 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422. Ten years later the Second Circuit reiterated its position in United States v. Varlack, 2 Cir. 1955, 225 F.2d 665: "We conclude under our view of the applicable law, that it was proper * * * to instruct the jury that if it believed the testimony of the Government witnesses with respect to the interstate or foreign commerce engaged in by the alleged victim * * * then, as a matter of law, the jurisdictional elements were *present and the only questions left open were whether the acts of the defendants constituted extortion or an attempt to extort and whether the defendants conspired to obtain money or property by such means.* * * *" The same problem before us was raised in the Third Circuit in United States v. Lowe, 3 Cir. 1956, 234 F.2d 919, cert. denied, 352 U.S. 838, 77 S.Ct. 59, 1 L.Ed. 2d 56.

"The next problem raised by the appellant *presents a question of law.* He complains of the original instructions by the court and certain supplemental instructions given because these instructions did not leave to the jury the determination of whether the alleged conduct by the defendant affected commerce or the movement of any article in commerce. There was testimony in the case concerning the part which this piece of pipe line played in a gas distribution system which had its origin in Texas to the effect that this particular piece of line was connected to a meter which was part of the main line from the source of supply. The trial judge mentioned these statements to jury and said 'If believed by you beyond a reasonable doubt [they] *satisfy the necessary federal jurisdictional element of interstate commerce under the law under which this indictment was drawn.'* In this instruction the judge was following Hulahan v. United States, 8 Cir. 1954, 214 F.2d 441, cert. denied 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675, as closely as though he had the report on his desk before him when he charged the jury. *We have no doubt that he was right."* (Emphasis supplied)

The first Mr. Justice Harlan, in Sparf v. United States, 1895, 156 U.S. 51, 15

---

ry to determine whether the facts have been proved, that is, *whether they believe the evidence* with respect to the factual elements of the indictment as explained in the charge.

The instructions of the trial judge below meet this standard.[35] He explained to the jurors that they were to determine whether they "believed" the prosecution's evidence with regard

S.Ct. 273, 39 L.Ed. 343, while not discussing the issue directly concluded that the judge's general function is properly to apply the law to various constructions of the facts rather than simply stating the law in general terms. The trial court had done so in the charge under consideration in that case. Also some of the charges that Justice Harlan excerpted from past cases and secondary materials exhibit such a function for the court. See 156 U.S. at 85, 15 S.Ct. at 286–287 (Com. v. Harman, [4 Pa.St. 269]); 92, 15 S.Ct. 289 (Chief Justice Shaw in the case of Anthes, [Com. v. Anthes, 5 Gray 185], quoting from Chief Justice Vaughan); 94, 15 S.Ct. 290 (Foster, Crown Law); and 95, 15 S.Ct. 290–291 (Wynne's Eunomus or Dialogues Concerning the Law and Constitution of England). Additionally, Justice Harlan's rationale that the will of the legislature should be uniformly applied, 156 U.S. at 71 & 89, 15 S.Ct. at 281 & 288, requires that the court leave to the jury only the fact finding, the court construing the legal consequences of various sets of facts.

The prohibition against directing a verdict in a criminal case means that the judge cannot tell the jury what verdict to bring in. If the evidence meets the statutory requirement and is uncontradicted, the judge may instruct the jury, "'* * * the evidence is uncontradicted * * *. Really, about all I left for your judgment, ladies and gentlemen, in Count I, is whether you were convinced beyond a reasonable doubt that the evidence as presented to you is what happened. And if you are convinced beyond a reasonable doubt, under the uncontradicted evidence he would be guilty under Count I.'" United States v. Ragsdale, 5 Cir. 1971, 438 F.2d 21, 24–25; cert. den'd 403 U.S. 919, 91 S.Ct. 2231, 29 L.Ed.2d 696. As Judge Clark has said, the Judge has not overstepped his bounds as long as he leaves to the jury "the final determination of credibility even though all the evidence was uncontradicted, and thus left to them that franchise which inheres in the jury system of pardoning even a culprit whose own testimony establishes his guilt." *Id.* at 27.

Judges Rives denies that he is making "an attempt to revive the democratic

theory that the jury in criminal cases should not only determine the facts but judge the law as well". The inevitable effect, however, of allowing the jury to determine what is interstate commerce under the Hobbs Act is to broaden the jury's raw power to substitute its own notion of justice for what is properly the law.

35. The judge's charge to the jury included the following language:

Now, Ladies and Gentlemen of the Jury, it is the duty of the Court and not the jury to determine whether the government's evidence, if believed, established that interstate commerce was affected by the conduct of the defendant so as to bring the activities of the defendants within the scope of the Hobbs Act and sustain federal jurisdiction.

I instruct you that if you find from the evidence beyond a reasonable doubt, that a conspiracy existed as charged in Count One or in Count Two or in both Counts One and Two of the indictment, and that one of the overt acts charged in each count was committed, that the Court has found, as a matter of law, that the requirements of the Hobbs Act under Section 1951 of Title 18 of the United States Code have been met as to interstate commerce being affected.

\* \* \* \* \*

Now, as to Count Three, I charge you that if you find from the evidence, beyond a reasonable doubt, one or more of the defendants named in this count, to be guilty as charged, the Court has found, as a matter of law, that the requirements of the Hobbs Act, that interstate commerce has been affected, has been met by the government's evidence, if believed.

\* \* \* \* \*

As to Count Four, I charge you that if you find one or more of the defendants named in this count to be guilty from the evidence presented to you, beyond a reasonable doubt, the Court has found, as a matter of law, that the evidence in connection with Count Four, if believed, meets the requirements of Title 18, Section 1951, United States Code, insofar as the conduct of the defendants having affected interstate com-

to interstate commerce. Indeed, at each point when the court instructed the jury as to the interstate commerce requirement, the court used the words *"if believed"* to impress upon the jury that it was the jury's function to determine whether the allegations against the defendants were true or false. In light of earlier instructions in the charge describing the role of the court as lawgiver and the role of the jury as factfinder, the phrase "if believed" underscores the court's careful efforts to have the jury understand the nature of its function. The defense attorneys did object that the court had not made clear to the jury that it was to determine the existence of the facts. But the trial judge twice pointed out that he had vocally emphasized the words "if believed" and had thereby made clear to the jury their role: "I underlined, if believed, on all four and bore down on it". Again, "Now, I point out to you that on each one of the instructions as to interstate commerce I have underlined, in red, if believed." Finally, with respect to Count Four the Court said: " * * * the Court has found, as a matter of law, that the evidence in connection with Count Four, *if believed*, meets the requirements of * *. * " the statute. Taking the instructions as a whole, Parr v. United States, 5 Cir. 1958, 255 F.2d 86, cert. denied 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64, we cannot say that in effect the court directed a verdict on this issue. Cf. United States v. Gollin, 3 Cir. 1948, 166 F.2d 123.[36]

We recognize that an acceptable approach in charging the jury might have been to enumerate the facts alleged by the government that, if believed by the jury, would meet the statutory requirement. A number of courts have done this when the facts supporting the interstate commerce aspect of the case were fairly simple.[37] But in a long involved case such as this one, a review of the factual allegations carried risks of omission, over-enumeration, over-simplification of some facts compounded by over-complication of other facts. The question whether to summarize the evidence is one within the trial court's discretion. *See* United States v. Gillilan, 2 Cir. 1961, 288 F.2d 796 (L. Hand), cert. denied, Apex Distributing Co. v. United States, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26; Orfield, Criminal Procedure under the Federal Rules § 30.13 at pp. 42–43 (1967).

In the context of this case we think that the trial court did not abuse its discretion in failing to enumerate the interstate commerce facts. The defense made no effort to contradict the facts relied on in finding interstate commerce affected. Additionally, none of the proposed charges submitted by the defendants contained such an enumeration. *See* Stilson v. United States, 1919, 250 U.S. 583, 588, 40 S.Ct. 28, 63 L.Ed. 1154. Although defense counsel submitted a number of proposed charges on the interstate commerce issue, these all reflect a misinterpretation of the law in that they attempted to give to the jury the question of law whether the facts alleged were sufficient to meet the statutory requirement of affecting or obstructing interstate commerce. Although neither of these factors would neutralize a directed verdict by the

merce, and thereby sustaining the Court's jurisdiction within the scope of the Hobbs Act.

36. In *Gollin* the court clearly took the issue away from the following instruction:
Under this state of facts you are instructed that as a matter of law the truck was moving in interstate commerce at the time it is contended by the government that the beer was stolen therefrom. That is a matter of law. The facts are not disputed and that con-

stitutes the jurisdiction of this court and is a matter for the court to determine and not a matter for the jury to determine.
166 F.2d at 125.

37. *See, e. g.,* Hulahan v. United States, 8 Cir. 1954, 214 F.2d 441, 445, cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675; Nick v. United States, 8 Cir. 1941, 122 F.2d 660, 673, cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550.

court, the question of enumeration is within the trial court's discretion.

## V. EVIDENCE OF GANTT'S GUILT

On appeal, Gantt's attorney argues that only one witness testified that Gantt had received any benefit from the alleged conspiracy, that there was no evidence that this involved extortion, and that the witness had initiated the suggestion that he could sell some stock to a friend of Gantt at a low price. This argument is without merit.

The evidence does show that Gantt received benefit from this deal. The friend to whom these stocks were "sold" was a carpenter, one Bowen, who was the brother-in-law of Harvey Wilson, one of the coterie. Checks amounting to $13,-000, the price at which the company theoretically bought back this stock although it had never really been paid for to begin with, all went to Gantt and Harvey Wilson. They had Bowen endorse the checks, and Bowen himself received only $350 for acting as the straw man.

The evidence also supports a finding that this transaction was extortionate. It is true that Baker, an officer of Diversified Financial Corporation, suggested to Gantt that there was available exempt, front-end stock that could be sold to a friend of Gantt at a very low price. But from the testimony, this may have been simply a suggestion as to the method of paying the extortion. Baker testified that he was told by his executive committee that he needed to see Gantt, that he wanted no trouble from Gantt, and that he felt that Gantt suggested to him that he had to give up stock in order to get his stock salesmen licensed. The jury was entitled to find extortion on this evidence.

Regardless whether Gantt did in this instance receive benefit from an extortionate transaction, there was other evidence of Gantt's participation in the conspiracies charged in Counts One and Two and the substantive offense charged in Count Four. That there was no other evidence of Gantt receiving personal benefit is irrelevant. One need receive no personal benefit to be guilty of extortion; the gravamen of the offense is loss to the victim. United States v. Provenzano, 3 Cir. 1964, 334 F.2d 678, 686, cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544.

With respect to Counts Two and Four, Gantt participated in the extortion from Century Acceptance. It was Gantt who took the records from the office of Century Discount of Prichard and brought them to a hotel in Mobile where Hyde said that the office staff should do the investigating and that he would take the matter from there. It was certainly proper for the jury to infer from this evidence that Gantt was a participant in the extortion operation.

With respect to Count One, Gantt called Orr, of Trans-Southern, into his office to sign an agreement with Security Merchants, another conduit, to effectuate the deal made with Hyde to pay $90,000. Additionally, Gantt was Assistant Attorney General-Assistant Securities Commissioner. Under Flowers' direction, he was in charge of processing the requests for approval of stock issues, for granting exemptions to sell front end stock prior to a public issue, and for licensing stock salesmen. In sum, the jury could conclude from the evidence that Gantt was part of the extortion pattern.

## VI. MOTION FOR CONTINUANCE BECAUSE OF KELLY'S ILLNESS AND SEVERANCE

Three days before the beginning of the trial James Kelly, one of the codefendants, suffered a serious heart attack. It was clear that he would be in no condition to proceed to trial for at least three months and possibly for an indefinite period. Therefore his case was severed from that of the other three defendants. They sought a continuance of their trial on the basis of the prejudice allegedly arising from Kelly's absence. The trial judge denied the continuance, and on appeal the defendants assert this as error.

The defendants contend that they were entitled to a continuance under Scott v. United States, 5 Cir. 1959, 263 F.2d 398, in which this court found that a denial of a continuance was an abuse of discretion allowed to the trial judge in passing on motions for postponement. That case is distinguishable. There two men were charged with a conspiracy to defraud. Bard, the chief conspirator according to the indictment, had pleaded nolo contendere before Scott's trial. Scott had subpoenaed Bard to testify at his trial and Bard had agreed to attend, but he failed to do so at the last minute on his doctor's advice.

The situation here is different in two respects. First, Kelly was a co-defendant still to be tried. The attorneys stated to the trial judge that there was no certainty that Kelly would testify in his own defense and that he would certainly not testify at the trial of Hyde, Flowers and Gantt, given his severance, even if his health would permit it. Given the uncertainty that any testimony could be expected from Kelly, the defendants were not entitled to a continuance on the ground that this was necessary to obtain the testimony of a crucial witness. *See* Blackwell v. United States, 5 Cir. 1969, 405 F.2d 625, 627, cert. denied, 395 U.S. 962, 89 S.Ct. 2104, 23 L.Ed.2d 747.

Second, according to the proof at trial, Kelly was much less important to the conspiracy here charged than was Bard, the chief conspirator in *Scott*. In response to the defense contention that Kelly's presence was crucial in order to rebut aspects of the proof, the prosecutor stated that he intended to put on no proof about Kelly's acting alone. The trial judge relied on this statement in denying the motion for continuance.

Kelly is not a central figure; he was basically a messenger and a conduit for funds. This can be seen by focusing on the three transactions the appellants cite in their briefs. With respect to payments by Trans-Southern, the defendants point to Orr's testimony that Kelly telephoned him and said that some of his payments were late. The defendants assert that this was the only evidence of any connection between the defendants and Trans-Southern's payments to Security Merchants. The record does not support this assertion. The testimony was that Orr met with Hyde, who told him that he would have to pay to get his stock issue approved. Kelly was merely present at this meeting. Later, Gantt told Orr to come to Montgomery; when he did, Gantt presented him with a contract between Trans-Southern and Security Merchants as the cover for making the payments earlier agreed to with Hyde. Kelly later telephoned Orr to remind him that a payment was overdue, but this was a minor point.

The second transaction cited by the defendants involved First American Life Insurance Company. Branum, the president of the company, met with Hyde, refused to pay what Hyde first demanded, and bargained over the price at which he would be allowed to issue stock. Two of the facets of the eventual agreement are relevant to Kelly: first, the company agreed to lend Kelly $50,000 with which to buy Hyde's house in Florida; second, Hyde was to be able to name a person to be put on the company's payroll at $1000 per month for four years. Kelly was the one named, and the understanding, as shown by a letter from Branum to Kelly, was that the payments would be used each month to pay off the mortgage note. Hyde was the chief actor for the defendants at the meeting; there was documentary evidence of the link between the salary to Kelly and the mortgage note payments. The only independent fact added by testimony as to Kelly was Branum's statement that Kelly said the house he was buying from Hyde with the company's money was actually for Richmond Flowers. But this is not independent action attributable to co-conspirators. It is a statement, the truth of which the defendants on trial would be in a position to evaluate and rebut—if untrue.

Third, Kelly arranged a meeting with Aspinwall and suggested that he introduce Aspinwall to Hyde. Kelly's absence

was not prejudicial here. On cross-examination, the defense was able to show that in fact Aspinwall had asked a third person, Wilkinson, to have Kelly get in touch with him.

At the time the court denied the motion for a continuance, it was likely that Kelly would be unavailable indefinitely. It was unlikely that he would have testified at the trial. *During the trial,* his absence from the defendants' councils was not prejudicial: he was not a chief actor in the conspiracy. *Before the trial,* the defendants had a great deal of time in which to consult with Kelly and they obviously had made use of the opportunity as shown in their cross-examination of Aspinwall with respect to his meeting with Kelly. We hold, therefore, that the trial judge did not abuse his discretion in denying a continuance. McKissick v. United States, 5 Cir. 1967, 379 F.2d 754.

## VII. ADMISSION OF TESTIMONY TO SHOW STATE OF VICTIMS' MINDS

■ The defendants object to several types of evidence the trial judge admitted. First, they object to testimony by victims and others concerning statements made to victims that payoffs were necessary to avoid unfavorable official action by the Attorney General's office.

For instance, Held, president of Paramount Life Insurance, testified that an attorney told him that payments were necessary for approval of stock issues. He also testified that he knew payments were required "because of things I knew to be true in the state." Orr testified that two named individuals told him that companies had to pay 5 percent for approval of stock issues in Alabama. Branum testified that he learned that payments were required from his general awareness of events in the state.

Hobbs Act cases have previously approved allowing similar testimony as bearing on the victim's state of mind. *See* United States v. Tolub, 2 Cir. 1962, 309 F.2d 286; United States v. Kennedy, 2 Cir. 1961, 291 F.2d 457; Nick v. United States, 8 Cir. 1941, 122 F.2d 660, 671,

cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550.

The statute does not require an explicit threat from the defendant.

It requires only that defendant induce his victim to part with property through the use of fear. 18 U.S.C. § 1951(b) (2). The jury is permitted to find such inducement by use of fear from testimony as to the state of mind of the victim * * *.

United States v. Tolub, 309 F.2d at 289. The victim's fearful state of mind is a crucial element in proving extortion. The testimony of victims as to what others said to them, and the testimony of others as to what they said to victims is admitted not for the truth of the information in the statements but for the fact that the victim heard them and that they would have tended to produce fear in his mind. As Professor Wigmore has pointed out:

Wherever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned.

Wigmore, Evidence § 1789 (1940). *See* Nick v. United States, *supra.* Thus it is no ground for objection that the third person making the statement to the victim is not produced as a witness or even that he is not named. The defendant's right of cross examination is preserved in that he can ask the witness whether he truly heard these fear-producing statements.

Such testimony may not be used to show that the defendants in fact made threats or otherwise made use of such fear in convincing the victims to pay. The jury here was properly instructed to consider the testimony only in determining the victims' state of mind.

The defendants vehemently object to the admission of testimony from Tortorigi's attorney, Newsome, that after his client had told him of receiving a de-

mand for payment he told Tortorigi this was "blackmail". The trial judge, however, instructed the jury in advance of the statement that it was relevant only to Tortorigi's state of mind. For this purpose the statement was admissible.

 The defendants' other evidentiary objections require no extended discussion. (1) They object to victims' testifying why they paid the money. This is another example of the admissibility of evidence to show the victims' state of mind. *See* Bianchi v. United States, 8 Cir. 1955, 219 F.2d 182, 192; Wigmore, Evidence § 581 (1940). (2) The government's reference to a prior statement of a witness, used to refresh his memory, as a "deposition" was not prejudicial. Reliance on Roberson v. United States, 5 Cir. 1956, 237 F.2d 536, therefore, is misplaced. (3) Branum's handwritten notes on the details of the settlement between Wolfinbarger and Hyde, made at a meeting at which Branum was present, were admissible under the Business Records exception to the hearsay rule. 28 U.S.C. § 1732. *See* United States v. Brewster, 2 Cir. 1956, 231 F.2d 213. Branum testified that he regularly kept informal notes of transactions on note cards in such situations. He turned these memoranda over to another officer of the company for safekeeping. Making memoranda of the details of a complicated oral business agreement would be within the business records exception. Such a record would be necessary for the regular operations of the company. There was no litigation in view, so the document is not self-serving. *See* Palmer v. Hoffman, 1943, 318 U.S. 109, 111–115, 63 S.Ct. 477, 87 L.Ed. 645, 648–651. And it is a factual rather than a conclusory record: the memoranda contain only what First American gave and what it received; the memoranda say nothing explicit about extortion.

## VIII. IMPROPER STATEMENTS IN THE TRIAL

The appellants raise the question whether the cumulative effect of a number of allegedly improper incidents, mainly actions of the prosecution and voluntary statements of witnesses, denied the defendants a fair trial. We find that some of the enumerated allegations involve no error; those that are erroneous did not deprive the defendants of a fair trial.

 At least one of the alleged improper actions of the government attorneys seems to us clearly within the scope of rebuttal. The prosecution asked why a government witness was concerned enough about the taking of his picture while he was conferring with federal agents in a public place to request the agents to get the picture back. He replied, "I was concerned that were the picture taker someone who was close to the Attorney General's office * * *." This was proper rebuttal. On cross-examination the defense had questioned the witness about sending the agents for the picture and had attempted to draw the inference from this incident that the witness had been drinking at the time. It was proper for the government attorney to ask his explanation of the events.

 There were statements by the prosecutor and witnesses that do seem improper. Yet they did not prejudice the defendants' trial.

(1) One witness, who was in charge of a company's books, testified on interrogation by defense counsel as follows:

These gentlemen told me they wanted to see the books and records of Dixie Air, Inc., for the purpose of determining whether Mr. Richmond Flowers or anyone else had received any money from Dixie Air registering some stock; *that someone had reported some income for this purpose and that someone else hasn't,* and we found no records where Dixie Air had made any payment to Mr. Richmond Flowers or to anyone else above the normal attorney fees and accountant fees who were paid to the local attorneys and accountants.

The defense objected to the italicized portion of the testimony on the ground

that it prejudiced the defendants by referring to pending tax prosecutions against some of the defendants. We conclude that the statement would not bring this fact to the jury's mind. Additionally, from the record it is clear that Flowers's attorney elicited the statement by his questioning despite the trial judge's effort to dissuade him from doing so in order to avoid any mention of the tax prosecution. The other defense attorneys made no objection to the question at the prior discussion, out of the hearing of the jury, about this line of questioning.

(2) The government attorney asked one witness on redirect examination if he remembered coming to the federal courthouse "during the Ed Pepper investigation." Pepper, a public official, was indicted along with Hyde before the grand jury returned the indictment in this case. The government attorney did not seem to be injecting this name purposefully; apparently he was attempting to show when the witness had first told him about payoffs, an issue that the defense had made much of on cross-examination. The trial judge stated that he thought the jury drew no inference "that there might be some other case that some of these defendants may or may not have been involved in."

(3) The prosecutor, after cross examining a defense witness using his grand jury testimony to refresh his recollection, offered his testimony saying "We would offer this in evidence, whatever it is worth." The court refused admission and the defense moved for a mistrial on the ground that forcing them to object to the admission of the testimony in front of the jury made it seem that harmful material was in the testimony. But there is no implication in the prosecutor's statement that the testimony contains anything other than what he had already refreshed the witness' memory about.

There were several other objections on the part of the defendants that do not merit any discussion. If the statements were improper, they did not amount to prejudice against the defendants, either individually or cumulatively.

Allegedly improper statements should not be viewed in the abstract. The question is what impact they had in the context of the particular trial in terms of their relevance and the quantity of untainted evidence in the case. In several decisions *reversing* convictions, this Court has said that one of the factors is the closeness of the case and the resulting greater impact that the improper statements would have. *See* Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Washington v. United States, 5 Cir. 1964, 327 F.2d 793; Handford v. United States, 5 Cir. 1957, 249 F.2d 295. And where convictions have been upheld despite improper statements, we have pointed out the small impact of the impropriety in the context of the particular trial. See Gurleski v. United States, 5 Cir. 1968, 405 F.2d 253; Handford v. United States, 5 Cir. 1958, 260 F.2d 890.

This trial lasted about six weeks and resulted in a record of approximately 4500 pages. The prosecution introduced evidence concerning a number of transactions; the case was not close on the sufficiency of the evidence. The defense attorneys were capable, experienced attorneys who objected to every conceivable error. They conducted a spirited defense. With respect to the statements they refer to, there "seems little, if any, likelihood that the jury could have been misled by [them] into returning a verdict based upon passion and prejudice." Handford v. United States, 260 F.2d at 892.

## IX. PREJUDICIAL NEWSPAPER PUBLICITY

As one would expect, the prosecution of the defendants received extensive publicity both before and during the trial. The defense moved at the outset that the court sequester the jury. The trial judge denied the motion. He did direct the jury at the beginning of the trial not to read news stories or listen to broad-

casts about the trial. He repeated this admonition at the end of each day and almost every other time the jury left the court room.

A number of times during the trial the defense brought to the court's attention newspaper headlines and stories said to be prejudicial, and asked for a mistrial. There was some discussion on several of these occasions about interrogating the jurors regarding any prejudicial influence. On one occasion the defense attorneys declined this offer of interrogation apparently on the theory that it would be more harmful than helpful. At another point it seems from the record that the trial judge characterized as facetious the idea that any interrogating of the jury about prejudicial influence should come from him. At one point the court did ask the jury as a whole whether any of them had read the news stories. And the court excluded reporters from several sessions outside the jury's hearing.[38]

After the guilty verdict, the defense moved for a new trial on the ground of prejudicial publicity and sought the presence of the jurors at a hearing on the motion in order to question them regarding prejudicial influence from the publicity. The trial judge denied the motion summarily. On appeal the defendants assert as error the denial of the motions for sequestration, mistrial, and hearing on jury prejudice.

The defendants' contention is not based on *pre*-trial prejudicial publicity. They do not attack the impartiality of the jury at the beginning of the trial. Instead the attack is directed at influence on the jury during the trial and alleged errors of the trial judge in failing to take further steps to insure that the jurors were not affected by the publicity.

Most of the prejudicial-publicity cases deal with the precautions that a trial judge should take to determine whether the jury has been exposed to what clear-

---

38. Since we decide that the publicity was not prejudicial we find no need to determine the adequacy of the trial judge's steps to ensure that the jurors were not exposed to any news media discussion of the case. The judge did charge the jury at the beginning of the trial not to look at news stories or listen to broadcasts concerning the trial, and he repeated this admonition often during the trial. He did not use the language suggested in the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.5(e) 196__ (Tent. draft). This is preferable because it makes the restriction understandable to jurors.

More troublesome, the judge at one point described as facetious the idea that any interrogating of the jurors about exposure to news stories should come from him. But this is the preferable practice, when requested by defense attorneys, to avoid further prejudicing the defendant's case. See Fair Trial and Free Press § 3.5(f) and Commentary. Additionally, the trial judge at the end of the evidence, asked the jury as a whole if anyone had received any prejudicial publicity that would prevent them from impartially deciding the case on the basis of the evidence introduced in court. There are two problems with this

action. First, this Circuit has determined that it is for the court, not the jurors themselves, to determine whether their impartiality has been destroyed by any prejudicial publicity they have been exposed to. Therefore, when there has been publicity that would possibly prejudice the defendant's case if it reached the jurors, the court should first ask the jurors what information they have received. Then it should ask about the prejudicial effect and it should make an independent determination whether the juror's impartiality was destroyed. *See id.;* Silverthorne v. United States, *infra.*

Further, there is a problem as to the method of interrogating jurors as to whether they have read or heard prejudicial publicity. In this case the court asked the jury as a whole if anyone had done this. Other circuits have held that individual interrogation is required only to determine prejudicial effect, after it is determined that a juror has read or heard prejudicial information. Margoles v. United States, 7 Cir. 1969, 407 F.2d 727, 735. The ABA recommends that even the questioning about what exposure to the publicity the juror has had should take place individually. Fair Trial and Free Press § 3.5(f).

ly is highly prejudicial information appearing in news media or whether any such exposure would prejudice the jury's ability to determine impartially the merits of the case. The cases have given less attention to drawing the line between what is prejudicial publicity and what is not. Those that have considered this issue support our conclusion that the publicity here was not prejudicial. See United States v. Manning, 5 Cir. 1971, 440 F.2d 1105; Gordon v. United States, 5 Cir. 1971, 438 F.2d 858.

This case does not involve the types of clearly prejudicial publicity found in almost all of the cases in which new trials are ordered. In most of those cases there were news stories containing information about the defendant that would not be admissible before the jury or that was not in fact put before the jury in court. Typical cases involved a government witness' testimony given out of the jury's presence, Margoles v. United States, 7 Cir. 1969, 407 F.2d 727; the defendant's assertion of his fifth amendment privilege out of the jury's presence, United States v. Palermo, 7 Cir. 1969, 410 F.2d 468; the defendant's past misdeeds unrelated to the charge on which he was being tried, Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250; United States v. McKinney, 5 Cir. 1970, 429 F.2d 1019, rehearing granted and different result reached, 434 F.2d 831. Another type of prejudicial news story is one that contains editorial comment by the writer about the defendant's guilt, either based on generally believed information, Sheppard v. Maxwell, 1966, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; or on an evaluation of evidence presented in court, Silverthorne v. United States, 9 Cir. 1968, 400 F.2d 627.

In this case there were no such news stories. In several articles the reporters speculated as to whether the defendants would testify. It was typical of these, however, that entire comment on this issue was the following language buried in the middle of the story: "Defense lawyers have not indicated whether they will put any of the defendants on the stand, but it is considered likely that at least Flowers will testify in his own defense." This can hardly be called inflammatory reporting. One story was headlined "Mystery Document Pops Up in Trial; May Not Be Admitted." But the story gave no hint as to the nature of the document. The jurors had seen the document when the government attorney held it during cross-examination of a defense witness. Thus the jurors would have learned nothing from the article that they had not known before retiring from the court room while the judge and attorneys considered the admissibility of the document.

The gist of the appellants' argument appears in the following language from one of the briefs:

These headlines and the articles following them constituted an evaluation of the case with the conclusion that the prosecutor's position was strong and the defense position was weak. It was typical of most of the articles introduced as exhibits that they presented a narrative condensation of the most damaging aspects of testimony by prosecution witnesses, ignoring weakening admissions made on cross-examination and often omitting proof of outright contradictions. They constituted [a] one-sided interpretation * * *.

The appellants thus attempt to liken their situation to that in Silverthorne v. United States, *supra*, where the Court of Appeals for the Ninth Circuit reversed a conviction. But the stories there were clearly evaluative. In one, the opinion noted, "[t]he headline read, 'DON'S TOP AID TAKES STAND— FAILS TO DELIVER', and characterized in the article which followed, the appellant's defense as having failed." Also, an article by a widely read columnist emphatically condemned the defendant as guilty. Additionally, the newspapers ran several headline stories implying that the defendants had been involved in sexual misconduct, inflamma-

tory material having nothing to do with the trial.

In this case the most that can be said about the news stories is that they summarized the high points of the days' events. Thus "Prosecution Busy Tying Loose Ends" does not necessarily involve an evaluation that the loose ends are those of an air-tight case. Nor does the headline "Flowers Defense has work cut out" reflect any more than a highlighting of the controversy taking place in the court room. That these headlines reflect typical reporting rather than editorializing by implication can be seen from the similar treatment given to the defense case. For instance, the same reporter responsible for the two stories under the previously mentioned headlines, wrote under the head "Flowers Placed in hot seat, calmly denies accusations" the following lead paragraphs:

Richmond Flowers is having his day in court. He's denying every charge, every allegation, every accusation— categorically, almost point by point.

The former Alabama attorney general and state securities commissioner, sonorous of voice, never flinching in staccato answers to a phalanx of defense questions, settled into the witness chair at 11:02 Monday, and he's still there today.

We cannot say that such reporting would have prejudiced a jury. As Mr. Justice Holmes wrote in Holt v. United States, 218 U.S. 245, 249, 31 S.Ct. 2, 5, 54 L.Ed. 1021,

* * * there is force in the judge's view that if juries are fit to play the part assigned to them by our law, they will be able to do what a judge has to do every time that he tries a case on the facts without them, and we cannot say that he was wrong in thinking that the men before him were competent for their task.

Although jurors cannot be thought impervious to outside prejudicial influence, here we do not have a case of the kind of news media pressure for a conviction such as that found in *Silver-*

*thorne* and in other cases where convictions have been reversed. These stories could not in the circumstances destroy the calmness and objectivity with which jurors must act in carrying out their constitutional role.

* * *

The judgments below are therefore affirmed.

RIVES, Circuit Judge (dissenting):

I respectfully dissent.

Near the beginning of the majority opinion, my colleagues "sketch some of the facts showing how the defendants operated." The "facts" so sketched are damning. They show the defendants to be guilty of extortion and leave little doubt as to their interference with commerce. I assume, however, that my colleagues do not mean to state "facts" as found by the District Court and approved by this Court, but mean no more than to say that there was sufficient evidence from which reasonable-minded jurors could have believed beyond a reasonable doubt that such are the true "facts." That is made clear later in that part of the majority opinion also dealing with the sufficiency of the evidence, but particularly as to the element of interference with commerce. Their footnote 29 explains that "after a verdict of guilty the evidence must be considered in the light most favorable to the government" as establishing the true "facts."

These prefatory remarks are made in the hope that we may not prejudge the guilt of the defendants. I agree that the evidence was sufficient from which the jury could properly have found the defendants guilty. However, ·it was also within the province of the jury to find them not guilty.

One of the crowning glories of our system of government is that in all criminal prosecutions the accused enjoys the right to trial by an impartial jury. Our forefathers considered that right of such importance that it was guaranteed twice, first in Article 3, Section 2, Clause 3 of

the Constitution and then in the Sixth Amendment. What I am trying to say has been expressed most eloquently for the Supreme Court by Justice Frankfurter:

"In view of the Government's insistence that there is abundant evidence to indicate that Bollenbach was implicated in the criminal enterprise from the beginning, it may not be amiss to remind that the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts.

"Accordingly, we cannot treat the manifest misdirection in the circumstances of this case as one of those 'technical errors' which 'do not affect the substantial rights of the parties' and must therefore be disregarded. 40 Stat. 1181, 28 U.S.C. § 391. All law is technical if viewed solely from concern for punishing crime without heeding the mode by which it is accomplished. * * * From presuming too often all errors to be 'prejudicial,' the judicial pendulum need not swing to presuming all errors to be 'harmless' if only the appellate court is left without doubt that one who claims its corrective process is, after all, guilty. In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be."

Bollenbach v. United States, 1946, 326 U.S. 607, 614, 615, 66 S.Ct. 402, 406, 90 L.Ed. 350.

The principle upon which I submit that the decision of this appeal should turn was explained by the elder Justice Harlan, as the organ of the Court, in Sparf and Hansen v. United States, 1895, 156 U.S. 51, 105, 106, 15 S.Ct. 273, 294, 39 L.Ed. 343:

"We have said that, with few exceptions, the rules which obtain in civil cases in relation to the authority of the court to instruct the jury upon all matters of law arising upon the issues to be tried, are applicable in the trial of criminal cases. The most important of those exceptions is that it is not competent for the court, in a criminal case, to instruct the jury peremptorily to find the accused guilty of the offense charged, or of any criminal offense less than that charged. The grounds upon which this exception rests were well stated by Judge McCrary, Mr. Justice Miller concurring, in United States v. Taylor, 3 McCrary, 500, 505. It was there said: 'In a civil case, the court may set aside the verdict, whether it be for the plaintiff or defendant, upon the ground that it is contrary to the law as given by the court; but in a criminal case, if the verdict is one of acquittal, the court has no power to set it aside. It would be a useless form for a court to submit a civil case, involving only questions of law, to the consideration of a jury, where the verdict, when found, if not in accordance with the court's view of the law, would be set aside. The same result is accomplished by an instruction given in advance to find a verdict in accordance with the court's opinion of the law. But not so in criminal cases. A verdict of acquittal cannot be set aside; and therefore, if the court can direct a verdict of guilty, it can do indirectly that which it has no power to do directly.' "

Judge Tamm, speaking for the D.C. Circuit in a recent case, relied heavily on earlier decisions of this Circuit in stating what I submit is the true rule:

"The rule that a directed verdict of guilty is invalid is enforced no matter how conclusive the evidence in the case may be.[1] While the judge in this

"[1]. 'Despite the strong evidence of guilt we cannot hold that this erroneous charge was harmless. No matter how conclusive the evidence, a court may not direct a verdict of guilt. While this charge did not direct the jury to

find the defendant guilty, it did take from the jury the question of [his] guilt.' Edwards v. United States, 286 F.2d 681, 682 (5th Cir. 1960).

case did not direct a verdict of guilty in form, that is the substantive effect of the instruction given. The rule against directed verdicts of guilt includes perforce situations in which the judge's instructions fall short of directing a guilty verdict but which nevertheless have the effect of so doing by eliminating other relevant considerations if the jury finds one fact to be true. As the Supreme Court said in Bollenbach v. United States, 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946), 'the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts.' See also Schwachter v. United States, 237 F.2d 640, 644 (6th Cir. 1956); United States v. Gollin, 166 F.2d 123, 127 (3d Cir.), cert. denied 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948); Carothers v. United States, 161 F.2d 718, 722 (5th Cir. 1947)."

United States v. Hayward, 1969, 136 U.S.App.D.C. 300, 420 F.2d 142, 144.

The majority decision in the present case is, I submit, in conflict with our decision (Judges Jones, Gewin and Clark) in United States v. Skinner, 5 Cir. 1971, 437 F.2d 164. The matter seems of such importance that I quote at length from Judge Jones' able opinion:

"The effect of this instruction was to direct the jury to find Skinner guilty unless it appeared that he was lacking in mental capacity to commit the offense with which he was charged. A directed verdict of guilt is not permitted, and this is true even though a defense of insanity is raised.

"The guide to our decision is charted by one of the leading cases decided by this Court where it is said:

"'A trial court has a wide latitude in commenting on the evidence during his instructions to the jury, but he has

no power to direct a verdict of guilty. An instruction deciding a material fact issue as a matter of law adversely to the accused is regarded as a partial instructed verdict of guilty prohibited by the rule just stated. In United States v. Raub, supra [7th Cir., 177 F.2d 312] the Court reversed the conviction under the plain error rule where the jury was instructed that a material element of the offense was established as a matter of law.

"'The appellant was entitled to have the question of whether there was an attempt to enter the bank for the purpose of robbing it submitted to the jury under appropriate instructions covering, among other things, the elements of this type of offense.' Mims v. United States, 5th Cir. 1967, 375 F.2d 135.

"The Court, in the Mims case, followed the principle announced in the earlier Edwards case where it was said:

"'Despite the strong evidence of guilt, we cannot hold that this erroneous charge was harmless. No matter how conclusive the evidence, a court may not direct a verdict of guilt. While this charge did not direct the jury to find the defendant guilty, it did take from the jury the question of Evans' guilt.' Edwards v. United States, 5th Cir. 1960, 286 F.2d 681.

And, in another opinion, the Court has said:

"'In the face of objections stated with precision and clarity complaining of the charge as a partial direction of a verdict of guilty and a failure to submit to the jury a crucial issue, the Court was obliged to take corrective steps so that the jury would clearly understand that it had three, not two, issues for decision. The failure to do this was a substantial and harmful error.' Roe v. United States, 5th Cir. 1961, 287 F.2d 435, cert. denied 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29.

As in the Roe case, so in this case, the district court should have given the jury three choices of verdict, guilty, not guilty or not guilty by reason of insanity.

The recent decision in United States v. Martin, 5th Cir. 1970, 434 F.2d 275, is not in conflict with the above decisions.

"The principles stated in the case of Mims v. United States, *supra,* require that the plain error rule of Rule 52(b) of the Federal Rules of Criminal Procedure, apply although no objection was made to the instructions as given. Only two choices were tendered to the jury, a verdict of guilty or a verdict of not guilty by reason of insanity. The jury was not told that it might reject the insanity defense of Skinner but nevertheless find that the elements of the offense had not been established beyond a reasonable doubt and if so, return a verdict of not guilty.

"Lord Coke is quoted as saying that reason is the life of the law. Charles Dickens, in Oliver Twist, had one of his characters say that the law is an ass. It may be that there are those in this day and time who would think it absurd for an appellate court to hold a trial court in error for failing to charge the jury that it might find a defendant not guilty of an offense which he did not deny having committed. Yet such is the law and reason is the life of the law."
437 F.2d at 165, 166.

The reasons for the rule are clearly stated by Chief Judge Aldrich of the First Circuit in an important recent case reversing the district court because it submitted special questions to the jury in addition to the general verdict of guilty or not guilty. Again, those reasons are of such extreme importance that I may be pardoned in quoting at length: "In civil trials the judge, if the evidence is sufficiently one-sided, may direct the jury to find against the defendant even though the plaintiff entered the case bearing the burden of proof. F.R.Civ.P. 50. In a criminal case a court may not order the jury to return a verdict of guilty, no matter how overwhelming the evidence of guilt.[38] This principle is so

"38. United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973; Sparf v. United

States, 1895, 156 U.S. 51, 105–106, 15 S.Ct. 273, 39 L.Ed. 343; Compton v. United States, 8 Cir., 1967, 377 F.2d 408, 411; Edwards v. United States, 5 Cir. 1960, 286 F.2d 681, 683; United States v. Taylor, C.C.D.Kan., 1882, 11 F. 470, 474.

well established that its basis is not normally a matter of discussion. There is, however, a deep undercurrent of reasons. Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn.[39]

"39. Indeed, under our law a jury's verdict, representing the common sense and wisdom of the community, is so highly regarded that the government itself may insist on trial by jury rather than trial by judge. Singer v. United States, 1965, 380 U.S. 24, 36, 85 S.Ct. 783, 13 L.Ed.2d 630.

Bushel's Case, 124 Eng.Rep. 1006 (C.P. 1670). In the exercise of its functions not only must the jury be free from direct control in its verdict, but it must be free from judicial pressure, both contemporaneous and subsequent. Commonwealth v. Anthes, 1857, 71 Mass. (5 Gray) 185, 209–210; Rex v. Larkin, [1943] K.B. 174; P. Devlin, Trial by Jury 14, 56, 75–91 (3d impr. with addendum, 1966); T. Plucknett, A Concise History of the Common Law 137–38 (5th ed. 1956); Howe, Juries as Judges of Criminal Law, 52 Harv.L.Rev. 582 (1939). Both have been said to result from the submission of special questions.

" 'It is one of the most essential features of the right of trial by jury that no jury should be compelled to find any but a general verdict in criminal cases, and the removal of this safeguard would violate its design and destroy its spirit.'

G. Clementson, Special Verdicts and Special Findings by Juries, 49 (1905).

" '[T]he submission of special interrogatories, answers to which are to accompany the general verdict * * *, [began as an effort] to catechize a jury as to its reasons * * *.'

Morgan, A Brief History of Special Verdicts and Special Interrogatories, 32 Yale

L.J. 575, 592 (1923). *See also* Walker, The Finality of Jury Verdicts, 118 New L.J. 866, 867–68 (1968). This merges into a more basic reason which the court noted but, because of special circumstances, did not accept in United States v. Ogull, S.D.N.Y., 1957, 149 F.Supp. 272, 276, affirmed without discussion of this point, sub nom. United States v. Gernie, 2 Cir., 1958, 252 F.2d 664, cert. denied, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073,

" 'To ask the jury special questions might be said to infringe on its power to deliberate free from legal fetters; on its power to arrive at a general verdict without having to support it by reasons or by a report of its deliberations; and on its power to follow or not to follow the instructions of the court. Moreover, any abridgement or modification of this institution would partly restrict its historic function, that of tempering rules of law by common sense brought to bear upon the facts of a specific case.'

The cogency of this is so felt by Mr. Justice Black and Mr. Justice Douglas that they disapprove of special interrogatories even in civil cases.[40]

"[40]. 'Such devices are used to impair or wholly take away the power of a jury to render a general verdict. One of the ancient, fundamental reasons for having general jury verdicts was to preserve the right of trial by jury as an indispensable part of a free government. Many of the most famous constitutional controversies in England revolved around litigants' insistence, particularly in seditious libel cases, that a jury had the right to render a general verdict without being compelled to return a number of subsidiary findings to support its general verdict. Some English jurors had to go to jail because they insisted upon their right to render general verdicts over the repeated commands of tyrannical judges not to do so. Rule 49 is but another means utilized by courts to weaken the constitutional power of juries and to vest judges with more power to decide cases according to their own judgments.'

Statement of Mr. Justice Black and Mr. Justice Douglas on the Rules of Civil Procedure and the Proposed Amendments, 31 F.R.D. 617, 618–619 (1963).

"We are less concerned by the jury's possible fear of subsequent criticism with respect to special findings than we are with the subtle, and perhaps open, direct effect that answering special questions may have upon the jury's ultimate conclusion. There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step. A juror, wishing to acquit, may be formally catechized. By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted. The result may be accomplished by a majority of the jury, but the course has been initiated by the judge, and directed by him through the frame of the questions.

"It may be said that since the law should be logical and consistent, if the questions were proper in substance this would be a desirable rather than an undesirable result. We agree, however, with the distinction made by L. Hand, J., concurring in Skidmore v. Baltimore & O. Ry., 2 Cir., 1948, 167 F.2d 54, 70, cert. denied, 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371, when speaking in favor of special verdicts in civil cases.

" 'I should like to subject a verdict, as narrowly as was practical, to a review which should make it in fact, what we very elaborately pretend that it should be: a decision based upon law. In criminal prosecutions there may be, and in my judgment there are, other considerations which intervene to make such an attempt undesirable.'

Uppermost of these considerations is the principle that the jury, as the conscience of the community, must be permitted to look at more than logic. Indeed, this is the principle upon which we began our discussion. If it were otherwise there would be no more reason why a verdict should not be directed against a defendant in a criminal case than in a civil one. *The constitutional guarantees of*

*due process and trial by jury require that a criminal defendant be afforded the full protection of a jury unfettered, directly or indirectly.* See Morris v. United States, 9 Cir., 1946, 156 F.2d 525." [Emphasis added.]

United States v. Spock, 1 Cir. 1969, 416 F.2d 165, 180, 181, 182.

Indeed my Brother Clark recognized the true rule in United States v. Ragsdale, 5 Cir. 1971, 438 F.2d 21, 27, when he said:

> "This Circuit is firmly committed to what appears to be the universal rule, that no matter how conclusive the evidence, a court may not direct a verdict of guilt in whole or in part. United States v. Skinner, 437 F.2d 164 (5th Cir. 1971). Any such instruction would amount to plain error which would be noticed, even though not assigned. Mims v. United States, 375 F.2d 135 (5th Cir. 1967)."

With the foregoing principles of law in mind, let us turn to the record to find whether the District Judge instead of the jury decided the question of interference with commerce.

The Hobbs Act "is directed at the protection of interstate commerce against injury from extortion." United States v. Green, 1956, 350 U.S. 415, 420, 76 S.Ct. 522, 526, 100 L.Ed. 494. Protection of commerce is the very gist of the crime, as the language of the statute makes clear: "Whoever in any way or degree obstructs, delays, or affects commerce * * * by * * * extortion * * * shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951. As Mr. Justice Black wrote for a unanimous Court in Stirone v. United States, 1960, 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252: "Here, as the trial court charged the jury, there are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage."

Because of the importance of the matter, at the risk of tedium, I quote at length from the record in order to demonstrate that from the beginning to the end of this trial the District Judge effectively deprived the jury of its role as the finder of the guilt of the defendants insofar as concerns that essential element of the crime, interference with commerce.

In the course of the Government's reply to the opening statements of counsel for the defendants, the following occurred:

> "MR. TAYLOR: May it please the Court, ladies and gentlemen, my name is Macey Taylor, Assistant to Mr. Weaver [the United States Attorney]. I will assist him in the prosecution of the case. I would like to reply, with the Court's permission, to very few things that distinguished counsel said to you and they may have been inadvertently misleading.
>
> "It is quite true that the effect on interstate commerce is an element of this offense, but each of us has a duty to perform in this case. Counsel will introduce evidence and make objections as was stated and you will be judges of the facts and the Court will make certain determinations. And I submit to you that it is the Court's function and not yours to find, that—first that interstate commerce existed and that the act involved affected, impeded, or delayed interstate commerce.
>
> "MR. REDDEN: We object to that incorrect statement of law, please the Court, because that might have to be found from disputed fact. That would be the province of the jury in every instance, not the Court.
>
> "MR. TAYLOR: We submit it is the Court's function to determine interstate commerce and its effect on it.
>
> "THE COURT: At this time I will let it stand.
>
> "MR. REDDEN: We except.
>
> "MR. TAYLOR: In spite of what counsel told you, you might be vitally

concerned with all the facts in the case, you need not concern yourself with commerce, interstate commerce affected, impeded, or obstructed.

"MR. REDDEN: We object to that and move to exclude it, please the Court. That is simply incorrect with reference to the fact that they would have no function.

"MR. TAYLOR: Your Honor, that's the court's function.

"THE COURT: It may be. It is possible.

"MR. TAYLOR: Well, the Court will instruct you on the law of this case. I believe he will instruct you that it is the Court's function to determine whether or not interstate commerce has been established and affected or impeded or obstructed. If it hasn't, he will take the case away from you."

Thus, before the jury heard any evidence, it was informed by the United States Attorney, with the concurrence of the District Judge, that "you need not concern yourself with commerce, interstate commerce affected, impeded, or obstructed," and further "I believe he will instruct you that it is the Court's function to determine whether or not interstate commerce has been established and affected or impeded or obstructed." The impression which these statements of Government counsel, tentatively approved by the Judge, inevitably had on the minds of the jurors was never removed throughout the six weeks trial. Was it not natural for the jurors to accept the invitation of the United States Attorney that "you need not concern yourself with commerce, interstate commerce, affected, impeded, or obstructed"? Further the prediction of the United States Attorney that "he [the Judge] will instruct you that it is the Court's function to determine whether or not interstate commerce has been established and affected or impeded or obstructed" turned out to be a true prophecy. In four separate parts of his charge to the jurors, the District Judge instructed them precisely as had been predicted by Government counsel:

(1) "Now, Ladies and Gentlemen of the jury, it is the duty of the Court and not the jury to determine whether the government's evidence, if believed, establishes that interstate commerce was affected by the conduct of the defendant so as to bring the activities of the defendants within the scope of the Hobbs Act and sustain federal jurisdiction.

"I instruct you that if you find from the evidence, beyond a reasonable doubt, that a conspiracy existed as charged in Count One or in Count Two or in both Counts One and Two of the indictment, and that one of the overt acts charged in each count was committed, that the Court has found, as a matter of law, that the requirements of the Hobbs Act under Section 1951 of Title 18 of the United States Code have been met as to interstate commerce being affected." (App. p. 298)

(2) "Now, as to Count Three, I charge you that if you find from the evidence, beyond a reasonable doubt, one or more of the defendants named in this count, to be guilty as charged, the Court has found, as a matter of law, that the requirements of the Hobbs Act, that interstate commerce has been affected, has been met by the government's evidence, if believed." (App. p. 299)

(3) "As to Count Four, I charge you that if you find one or more of the defendants named in this count to be guilty from the evidence presented to you, beyond a reasonable doubt, the Court has found, as a matter of law, that the evidence in connection with Count Four, if believed, meets the requirements of Title 18, Section 1951, United States Code, insofar as the conduct of the defendants having affected interstate commerce, and thereby sustaining the Court's jurisdiction within the scope of the Hobbs Act." (App. p. 301)

(4) "Now, extortion and commerce, as defined in the statute, are essential elements of proof that the government must meet before an offense can be proven under Title 18, Section 1951.

"Whether or not commerce has been affected is a matter of law for the Court to determine from the evidence, if believed.

"The proof of extortion by the evidence beyond a reasonable doubt is a matter for you, the jury, to determine." (App. p. 310–311)

Lawyers, as well as jurors, know that cases do arise in which questions of fact are for the determination of the trial judge and not of the jury. For example, statutes and decisions of other states are facts to be proved. Eastern Building and Loan Assn. v. Williamson, 1903, 189 U.S. 122, 126, 127, 23 S.Ct. 527, 47 L.Ed. 735. Nonetheless, it is the function of the trial judge instead of the jury to determine the state of the foreign law from the proof presented on that issue. Finney v. Guy, 1903, 189 U.S. 335, 342, 343, 23 S.Ct. 558, 47 L.Ed. 839; Liechti v. Roche, 5 Cir. 1952, 198 F.2d 174, 177; Daniel Lumber Co. v. Empresas Hondurenas, S.A., 5 Cir. 1954, 215 F.2d 465, 469, 470. *Accord*, Rule 26.1, Fed.R.Crim.P., added Feb. 28, 1966. Somewhat similarly, where decision of a question of domestic law by a trial court depends on an inquiry into surrounding facts and circumstances, the court must refuse to grant summary judgment until the facts and circumstances have been sufficiently developed to enable the court to be reasonably certain that it is making a correct determination of the question of law. Palmer v. Chamberlin, 5 Cir. 1951, 191 F.2d 532, 540.

Thus, in the present case, the District Judge and the Government seem to have been laboring under the delusion that the issue of interference with commerce went to the jurisdiction of the court, and hence was for the court to decide. The majority opinion begins its discussion of the sufficiency of the evidence on interference with interstate commerce with the statement that "The defendants urge on appeal that this *jurisdictional element* was not proved below" (emphasis added, see opinion p. 835), and in its discussion states that "this is a jurisdictional element for which the court has a great responsibility" (opinion p. 839). With deference, I submit that at the evidentiary stage of a trial, proof of that issue goes to the court's jurisdiction only in the same sense as proof of the other issue, extortion. That is to say, if there were no evidence whatever to support either issue the conviction of the defendants would be a violation of due process. Thompson v. Louisville, 1960, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654. At the evidentiary stage of the trial there is nothing unique about the commerce issue as a "jurisdictional element." In support of the statement made in the preceding sentence, it may be best to explain at length the basis of my dissenting view.

The district courts of the United States have original jurisdiction of all offenses against the laws of the United States. 18 U.S.C. § 3231. Extortion, in the sense of obtaining money or some other thing of value by a misuse of official power or position, is a well-recognized common-law crime. 35 C.J.S. Extortion § 1, p. 355; 31 Am.Jur.2d Extortion, Blackmail, etc., § 3, p. 902. Of course "there are no common law offenses against the United States and therefore the only federal crimes are those explicitly prescribed by Congress." 1A Moore's Federal Practice, 2d ed., ¶ 0.323 [5], p. 3734. Congress has the power under the Constitution to regulate commerce among the several states, with foreign nations, and within the District of Columbia or any territory or possession of the United States. Acting under this broad commerce power, Congress enacted the Hobbs Act, 18 U.S.C. § 1951. Thus, in this case there is no doubt that the District Court was vested with jurisdiction of the subject matter, that is, to try persons charged with violation of the Hobbs Act.

Jurisdiction to try and punish for the particular crimes charged was vested in the District Court by the return of the indictment. Albrecht v. United States, 1927, 273 U.S. 1, 8, 47 S.Ct. 250, 71 L.Ed. 505; 22 C.J.S. Criminal Law § 143. The defendants submitted themselves to the jurisdiction of the Court. Thus, by the time the trial commenced the District Court had been vested with jurisdiction both of the offense and of the persons of the defendants.

It is hornbook law that, "Generally, the jurisdiction of a court depends on the state of facts existing at the time it is invoked, and once a court obtains jurisdiction of the person of the accused and of the subject matter, it retains the same until final disposition or determination of the case in accord with the law." 22 C.J.S. Criminal Law § 165, p. 422.

True, when a court having jurisdiction of the subject matter and of the accused denies to the accused a basic constitutional right such as due process of law, its jurisdiction ceases and its acts are void. But there is no claim here that the Court has thus undermined the jurisdiction vested in it at the commencement of the trial.

Why then is the sufficiency of the evidence as to the effect on interstate commerce placed in a different category as a "jurisdictional element" which falls within the province of the judge to decide? Why is not that element for the jury to decide precisely the same as the element of extortion *vel non*? Both elements go to the substance of the federal crime. If the jury finds no extortion, then no crime, state or federal, has been proved. If the jury finds no interference with commerce, then no federal crime has been proved.

True, the Federal Government's jurisdiction of this crime rests on interference with commerce. But such interference had been adequately charged in the indictment, and jurisdiction would not be lost if the jury determined the facts of such interference in favor of the accused. That would amount simply to a failure to convince the jury of the defendants'

guilt beyond a reasonable doubt. In short, the "jurisdictional" nexus of the commerce element does not permit the District Judge to deprive the jury of its role in finding the facts regarding interstate commerce.

In objecting to the instructions which have been quoted at length, the defendants fully complied with Rule 30, Fed.R. Crim.P.

"MR. REDDEN: Please the Court, on behalf of each defendant, separately and severally, we except to that portion of Your Honor's oral charge wherein Your Honor stated that if you find from the evidence, stated this in substance, if you find from the evidence beyond a reasonable doubt that a conspiracy existed as charged in Count One and in Count Two of the indictment, and that an overt act in furtherance of the object of that conspiracy was committed as to each of those counts, the Court has found, as a matter of law, that interstate commerce has been affected. We further except along the same line to substantially the same statement made with reference to Count Three and Count Four. Of course, Your Honor rephrased it because those are substantive counts as opposed to conspiracy charges, saying, in substance, I think, that if you are convinced beyond a reasonable doubt that one or more of the defendants is guilty of extortion as charged in said count, the requirements of the Hobbs Act have been met by the evidence if believed; on this ground, that the Court has charged the jury, and I think one time in one of the statements with reference to some count, that it was not predicated on the words if believed.

"THE COURT: Yes.

"MR. REDDEN: I think the import of what Your Honor has said eliminates from the mind of the jury that they have the prerogative, if they do not believe the evidence relative to the existence of commerce or any affect on commerce, affect on commerce, to reject that evidence. I would feel that

under this instruction they wouldn't think that they had that right.

"THE COURT: I underlined, if believed, on all four and bore down on it. I would overrule your objection to it.

"MR. REDDEN: All right, sir." (App. 324, 325)

The majority concedes that, "The defense attorneys did object that the court had not made clear to the jury that it was to determine the existence of the facts." (Opinion, p. 842.) Nonetheless the majority opinion comments: "none of the proposed charges submitted by the defendants contained such an enumeration [of the interstate commerce facts]." (Opinion, p. 842.) Having complied with Rule 30, no duty rested on defense attorneys to propose charges which might or might not cure the District Court's error. As expressed in Rule 51, Fed.R.Crim.P.: "[I]t is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor." Indeed the error of the Court in itself deciding one of the elements of guilt is so fundamental that even if the defendants had failed to comply with Rule 30, the error would have to be recognized under Rule 52(b), Fed.R. Crim.P., the plain error rule. Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 148; United States v. Skinner, *supra*; United States v. Ragsdale, *supra*.

Each of the four separated jury instructions, heretofore quoted, *ante* pp. 856–857, uses the identical expression "if believed." When confronted with the objection that "the import of what Your Honor has said eliminates from the mind of the jury that they have the prerogative, if they do not believe the evidence relative to the existence of commerce or any affect on commerce * * to reject that evidence, * * * under this instruction they wouldn't think that they had that right," the District Judge responded, "I underlined, if believed, on all four and bore down on it" (App. p. 325), and again, "Now, I point out to you

that on each one of the instructions as to interstate commerce I have underlined, in red, if believed." (App. p. 328) The Court's explanations for overruling the objections of defendants' attorney were of course made while the jury was absent. The jury did not take the charge with them and had no means of knowing that the Judge had underlined in red "if believed." Even if the jurors had seen the red underlining or had heard some vocal emphasis, which the record cannot reproduce, placed on the words "if believed," they could not equate such an instruction with "if believed *by the jury*" or "if believed *beyond a reasonable doubt by the jury.*" Not once was the jury instructed that the jurors were the ones who would have to entertain such a belief. With deference, I submit that the majority is in error when it says, "He [the District Judge] explained to the jurors that they were to determine whether they 'believed' the prosecution's evidence with regard to interstate commerce." (App. p. 36) The only source which the majority gives for that statement is: "In light of earlier instructions in the charge describing the role of the court as law-giver and the role of the jury as fact-finder, the phrase 'if believed' underscores the court's careful efforts to have the jury understand the nature of its function." (Opinion, p. 842.) The "earlier instructions" so referred to consisted of no more than the usual boilerplate instructions, such as:

> "You are judges of the facts, and it is your duty and function to determine the facts in this case without prejudice, fear or favor, and solely from a fair consideration of the evidence presented to you here in this courtroom.
>
> \* \* \* \* \* \*
>
> "Now, the evidence presented to you should be considered and viewed by you in the light of your own observations and experience in the affairs of your own lives.
>
> "If during the trial you may think the Court has in any way intimated any opinion as to the facts, you are not

bound by that opinion. The jury alone is the sole and exclusive judge of the facts.

"You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You should carefully scrutinize the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness's intelligence, motive and state of mind, and demeanor and manner while on the stand. Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence." (App. 290, 291, 295)

Potent as those general instructions may have been, they make no special reference to the subject of interstate commerce. The particular should prevail over the general. In addition, the Court's instructions left uncorrected the observations of the United States Attorney in his opening statement and the District Judge's rulings on those remarks, quoted *supra*, p. 856–857.

Further, the jurors were led to believe that the District Court's general instructions had no application to the interstate commerce question, by such repeated instructions as:

"* * * it is the duty of the Court *and not the jury* to determine whether the government's evidence, if believed, establishes that interstate commerce was affected by the conduct of the defendant * * *.

* * * * * *

"* * * the Court has found, as a matter of law, that the requirements of the Hobbs Act, that interstate commerce has been affected, has been met by the government's evidence, if believed.

* * * * * *

"* * * the Court has found, as a matter of law, that the evidence in connection with Count Four, if believed, meets the requirements of Title 18, Section 1951, United States Code, insofar as the conduct of the defendants having affected interstate commerce * * *.

* * * * * *

"Whether or not commerce has been affected is a matter of law for the Court to determine from the evidence, if believed." (App. 298, 299, 301, 310)

None of the Hobbs Act cases on which the majority relies go anything like so far as did the District Judge toward depriving the jury of its role in finding the facts regarding interstate commerce. The genesis of that line of cases is the holding in Nick v. United States, 8 Cir. 1941, 122 F.2d 660, 673:

"The second item (assignment 29 (i)) is directed at a statement by the court that 'if the evidence of the witnesses outlining the effect of stoppage of the motion picture industry in St. Louis is to be believed *and is believed by you*, the result, of course, is direct and substantial interference with or effect upon interstate commerce.' The criticism is that this is an improper comment upon the evidence and is argumentative in that it states to the jury that if they believe certain evidence they must believe that there is direct and substantial interference with interstate commerce. There is no proper basis for this criticism. It is not for the jury to determine what is or what is not interstate commerce —that is a question of law. It is for the court to charge the jury that if certain facts covered by the evidence are shown then there is such interference. This is what the court stated and its statement is proper." [Emphasis added.]

Following that holding, the Eighth Circuit in Hulahan v. United States,

1954, 214 F.2d 441, 445, approved the following instructions:

> " 'I charge you, as a matter of law, that if you believe the testimony of the Government witnesses with reference to the federal jurisdictional element of interstate commerce involved in this case, that is to say, the Government's testimony with reference to the bringing of various materials, commodities, and equipment, from out of state to the job sites in question in this federal judicial district, then you are instructed that defendant's activities as shown by the Government's testimony, *if you believe the same,* did delay, obstruct and affect interstate commerce as that language is used in the statutes under which these charges are brought. That is to say, *if you find the facts to be as testified* to by the Government witnesses, the Court has determined as a matter of law that there has been a substantial affect on interstate commerce shown here by the United States and that question is not for your determination. However, before you can find the defendant guilty under any or all of the counts in the indictment you must find beyond a reasonable doubt that the defendant has extorted money or property or conspired so to do, as those terms are defined in the statute and other instructions given you by the Court.' " [Emphasis added.]

Relying on *Hulahan,* the Second Circuit approved a "virtually identical" instruction. United States v. Varlack, 1955, 225 F.2d 665, 670, 671, 672.

In United States v. Lowe, 3 Cir. 1956, 234 F.2d 919, 922, 923, it was said:

> "The next problem raised by the appellant presents a question of law. He complains of the original instructions by the court and certain supplemental instructions given because these instructions did not leave to the jury the determination of whether the alleged conduct by the defendant affected commerce or the movement of any article in commerce. There was testimony in the case concerning the part which this piece of pipe line played in a gas distribution system which had its origin in Texas. There was testimony to the effect that this particular piece of line was connected to a meter which was part of the main line from the source of supply. The trial judge mentioned these statements to the jury and said '*if believed by you beyond a reasonable doubt* [they] satisfy the necessary federal jurisdictional element of interstate commerce under the law under which this indictment is drawn.' In this instruction the judge was following Hulahan v. United States, 8 Cir., 1954, 214 F.2d 441, 445, certiorari denied 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675, as closely as though he had had the report on the desk before him when he charged the jury. We have no doubt that he was right. The position taken in the Hulahan case is strengthened by the decision of the Second Circuit in United States v. Varlack, 1955, 225 F.2d 665, 670." [Emphasis added.]

The holding of the Seventh Circuit in United States v. Green, 1957, 246 F.2d 155, 160, 161, following the Eighth Circuit's decision in *Nick* and *Hulahan:*

> "At the close of the evidence the trial court gave the following instruction to the jury: '[The charge] is a violation by force or threatened force, intimidation of workers or persons concerned in the construction of what is alleged to have been an interstate commerce highway. That is the charge and that is the matter which you must decide here. Now so far as this being an interstate commerce tramway or highway or whatever we may desire to call it, *if you believe the testimony of the Government witnesses,* it is unquestionably an interstate commerce highway. \* \* \* ' It was clearly the function of the court to determine whether interstate commerce was affected and whether the court had jurisdiction under the Act. As stated in Hulahan v. United States, supra, 214 F.2d at page 446: 'We think it was for the court, and not the jury, to determine whether the Government's

evidence, if believed, would bring the activities of the defendant within the statute and sustain federal jurisdiction.' See also Nick v. United States, 8 Cir., 122 F.2d 660, 673, 138 A.L.R. 791" [Emphasis added.]

Thus each of the cases in this line, which the District Court attempted to follow, clearly and expressly left to the jury the question of whether *it* believed the testimony of the Government witnesses regarding interstate commerce, while in the present case the effect of the District Court's rulings, from the opening statements of counsel to the final instructions by the Court, was to direct the jury to find for the United States as to that element of the crime.

It is thus not necessary for me to express disagreement with *Nick, supra,* and its progeny. Nonetheless, with extreme deference, I do disagree with *Hulahan's* expansion of the *Nick* doctrine, for reasons which have already become apparent. At the evidentiary stage of the trial, jurisdiction was already firmly vested in the trial court, and it was *not* for the Court to determine whether the Government's evidence, if believed, would bring the activities of the defendants within the statute. Instead, it was the function of the jury to determine the guilt of the defendants as to each and all of the elements of the federal crime. Further, whether commerce was in any way or degree obstructed, delayed, or affected is not a pure question of law, but is a mixed question of law and fact, upon which the jury should have the final say in its verdict. Lastly, and of utmost importance, I submit that when the court is permitted to charge the jury that, if it believes the Government's evidence, an element of the crime has been established, there occurs a breach in that great bulwark of liberty so effectively established by the constitutional right to be tried by a jury. If that constitutional guaranty is to be preserved intact, the court should charge the jury as to the law, and leave to the jury the application of the law to the facts. In fact as well as in form, a defendant should not be

convicted of any element of a crime unless and until the jury returns its verdict of guilt.

Of course, I make no attempt to revive the democratic theory that the jury in criminal cases should not only determine the facts but judge the law as well. That question was authoritatively settled as far back as 1895 in Sparf and Hansen v. United States, *supra,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343. As explained in Howe, "Juries as Judges of Criminal Law," 52 Harv.L.R. at 588, 589:

"In that case the Supreme Court was first called upon conclusively to dispose of a problem which for more than one hundred years had been discussed and litigated in the lower federal courts. The majority of the court, in a fifty-five page opinion written by Mr. Justice Harlan, held that the jury is bound, in criminal as in civil cases, to follow the judge's instructions on all matters of law. In a dissenting opinion of some seventy-three pages Mr. Justice Gray, with Shiras, J., concurring, elaborately and painstakingly examined the state and federal decisions concerning the question and determined that it was preferable, historically and politically, to acknowledge that the jury had a right in criminal cases to disregard the court's instructions."

Since the decision in *Sparf and Hansen,* it has been true in federal and most other American courts that the jury's right to return a general verdict in criminal cases gives it a naked power, but not a moral or legal right to determine the law upon its own initiative regardless of the court's instruction. 52 Harv. L.R. 584. The majority decision in the present case not only seeks to destroy that "power" of the jury but goes much further and substitutes the judge for the jury as the finder of facts. To swing the judicial pendulum that far is, I submit, in clear violation of the defendants' constitutional rights.

In addition to the foregoing extravagantly long dissent, I have strong misgivings as to the composition both of the

grand jury and of the petit jury, but shall refrain from elaborating. With the remaining parts of the majority opinion, I am in substantial agreement. I dissent from the judgments of affirmance.

## ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC

### PER CURIAM:

The Petitions for Rehearing are denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petitions for Rehearing En Banc [1] are also denied.

RIVES, Circuit Judge, dissents from the denial of the petitions for rehearing by the panel.

1. Circuit Judges Gewin, Coleman and Godbold did not participate in the consideration or action on the petition for rehearing en banc.